UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 6:11-cr-401-Orl-37DAB

FREDERICK MERVIN BARDELL

# UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE OR HOME CONFINEMENT

The United States opposes the defendant's motion for compassionate release and/or home confinement pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) based on his suspected diagnosis of colon cancer, which he describes as his "chronic medical condition which also presents a very high risk of contracting COVID-19" (*see* Doc. 77). The defendant's suspected diagnosis is undoubtedly concerning. Nevertheless, there is not yet any indication that his condition is terminal. And as the defendant's medical records indicate, the Bureau of Prisons (BOP) is actively addressing the issues and there is no indication that he cannot receive adequate care in custody.

Moreover, this Court should deny the defendant's request for an order directing the BOP to transfer him to home confinement. Finally, with respect to COVID-19, the defendant's medical records indicate that he already tested positive for it in July 2020, was isolated, and did not experience severe illness

requiring hospitalization. And in any event, BOP has implemented a COVID-19 action plan to minimize the risk of transmission into and throughout its facilities.[1] Accordingly, the defendant has not presented extraordinary and compelling reasons to grant compassionate release.

## I. Background.

This Court sentenced the defendant to 151 months' imprisonment after he pled guilty to Distribution of Child Pornography. (Doc. 59.) According to the plea agreement, the defendant distributed child pornography through a peer-to-peer file-sharing program. (Doc. 32 at 13.) He often saved images of child pornography to an external hard drive. (*Id.* at 15.) The investigation revealed that the defendant possessed more than 17,000 child sex abuse images and movies, including images that depicted bestiality, sadism and masochism, and the violent rape of children. (*Id.* at 17.) When he was apprehended in 2011, the defendant said that he had first seen an image of child pornography in the 1990s, and that viewing child pornography was a problem for him, but he had never sought treatment for it. (*Id.* at 15)

The defendant is currently incarcerated at FCI-Seagoeville in Seagoville, Texas, is 54 years old, and is projected to be released on March 10, 2023. *See*

[1] *See* BOP Implementing Modified Operations, available at https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed on Nov. 9, 2020).

BOP Inmate Locator at https://www.bop.gov/inmateloc/ (last accessed on Nov. 9, 2020). The defendant has been in custody since 2012. (Doc. 60.)

On November 6, 2020, the defendant filed the instant motion for compassionate release relying on the threat posed by the COVID-19 pandemic, particularly in light of a suspected colon cancer diagnosis. (Doc. 77.)

The United States is cognizant of inmate concerns stemming from COVID-19. The United States, nor the BOP, minimize the concern or risk; this unique situation is being diligently monitored. The BOP has taken aggressive action to mitigate the effects of COVID-19, and has been taking proactive steps to prevent potential coronavirus transmissions for months. As detailed below, the United States opposes the defendant's requested relief.

## II. The BOP's response to COVID-19.

COVID-19 is a dangerous illness that, in a short time, has caused many deaths in the United States and a massive disruption to our society and economy. The BOP continues to take significant measures to protect the health of the inmates in its charge. To aid this Court in its consideration of the defendant's motion, a summary of the BOP's response to COVID-19 follows.

The BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. *See* BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed. It establishes a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, the BOP began planning for potential coronavirus transmissions in January 2020 by establishing a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned space in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social

distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been canceled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g., medical or mental health care, religious, etc.) or those

who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of the BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13 and remain suspended to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased inmates' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits are permitted on a case-by-case basis after infection screening in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

## III. As part of its response to COVID-19, the BOP may designate certain inmates to a term of home confinement.

In an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, the BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place

prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance the BOP's flexibility to respond to the pandemic. Under the CARES Act, enacted on March 27, 2020, the BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General gave the BOP Director the authority to exercise this discretion, beginning at the facilities that so far have seen the greatest incidence of coronavirus transmission. *See* April 3, 2020 Memorandum to Director of Bureau of Prisons.[2]

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in BOP institutions. The BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to

---

[2] BOP has described its increased use of home confinement on its website: https://www.bop.gov/resources/news/20200405_COVID19_ home_confinement.jsp. 17. Inmates do not need to apply to be considered for home confinement. BOP Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General. While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager.

maintain the safety of prison staff and inmates while also fulfilling incarceration orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But the BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## IV. The legal framework of the defendant's home-detention request.

The defendant has asked that this Court order BOP to place him on home confinement. The defendant's present request must be denied because this Court has no authority to direct the BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to the BOP's discretion.

*See United States v. Calderon*, 801 F. App'x 730 (11th Cir. 2020) (district courts lack jurisdiction to grant early release to home confinement pursuant to Second Chance Act, 34 U.S.C. § 60541(g)(1)(A)).

Once a court imposes a sentence, the BOP is solely responsible for determining an inmate's place of incarceration to serve that sentence. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam)[3]; *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *Tapia v. United States*, 564 U.S. 319, 331 (2011) ("[a] sentencing court can recommend that the BOP place an offender in a particular facility or program ... [b]ut decision making authority rests with the BOP."); 18 U.S.C. § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment[.]"). Because the defendant's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only the BOP may consider his request.

Moreover, neither the Constitution nor statute allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S.

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). Following the imposition of sentence, courts have limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Diaz-Clark*, 292 F.3d 1310, 1319 (11th Cir. 2002). Section 3582(c) contemplates only a reduction in sentence. *See* § 3582(c). But the defendant's request to serve the rest of his term in home confinement, as opposed to prison, works no reduction to his sentence. Home confinement merely permits the inmate to serve out his term of imprisonment at home. The defendant's request for such relief therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Because § 3582(c) deprives this Court of jurisdiction to grant home confinement and because the defendant offers no other statutory authority to support his request for such relief, this Court has no authority to act on his request for home confinement.[4]

[4] If a court grants a sentence reduction, it may "impose a term of … supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." USSG §5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with USSG §5F1.2. *See* § 3583(e)(2).

## V. The legal framework of the defendant's compassionate release request.

A court may reduce a term of imprisonment upon finding "extraordinary and compelling circumstances," consistent with applicable policy statements of the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A). Under the statute, as amended by Section 603(b) of the First Step Act, this Court may act "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

The Sentencing Commission's policy statement addressing sentence reductions under § 3582(c)(1)(A) provides examples of qualifying "extraordinary and compelling reasons" including (1) terminal illness; (2) a serious medical condition that substantially diminishes the ability of the defendant to provide self-care in prison; or (3) the death of the caregiver of the defendant's minor children. *See* USSG §1B1.13 comment. (n.1).[5] Even when an

[5] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

extraordinary and compelling reason exists, however, a court should only grant a motion for release if it determines that the defendant is not a danger to the public. USSG §1B1.13(2).

Previously, only the BOP could file a motion for compassionate release. The First Step Act amended the provision to permit a defendant to bring a motion upon the *earlier* of either (1) the exhaustion of all administrative rights to appeal the BOP's failure to bring a motion to reduce his sentence (the exhaustion requirement) *or* (2) the lapse of 30 days from the BOP's receipt of the defendant's request that the BOP bring such a motion (the lapse requirement). *See* First Step Act of 2018, 115 P.L. 391, § 603(b)(1); *see also United States v. Gardner,* 2020 WL 1673315, at *1 (D. Minn. Apr. 6, 2020).[6]

[6] Some courts-–including some within the Middle District of Florida—have held that, if the warden denies a request during the first 30 days, the inmate cannot proceed to court until administrative remedies are fully exhausted. *See United States v. Read*, 2020 WL 3103983, *2 (M.D. Fla. June 11, 2020) (J. Chappell); *United States v. Raftopoulos*, 2020 WL 3064793, *3 (M.D. Fla. June 9, 2020) (J. Antoon); *United States v. Rodriguez-Begerano*, 2020 WL 3000737, *2 (M.D. Fla. June 4, 2020) (J. Covington); *United States v. Chappell*, 2020 WL 2573404, *1–2 (M.D. Fla. May 21, 2020) (J. Covington); *United States v. Eyerman*, 2020 WL 2466189, *2–3 (M.D. Fla. May 13, 2020) (J. Steele); *United States v. Weidenhamer*, 2020 WL 1929200 (D. Ariz. Apr. 21, 2020); *United States v. Miller,* 2020 WL 113349 (D. Idaho Jan. 8, 2020); *United States v. Elgin*, 2019 U.S. Dist. LEXIS 86571, *3 (N.D. Ind. May 23, 2019); *United States v. Watson*, 2020 WL 1890541, at *3 (N.D. Okla. Apr. 16, 2020); *United States v. Hilton*, 2020 WL 836729 (M.D.N.C. Feb. 20, 2020); *United States v. Nance*, 2020 WL 114195 (W.D. Va. Jan. 10, 2020); *United States v. Mendoza*, 2019 WL 6324870, at *4 (D. Minn. Nov. 26, 2019); *United States v. Becks*, 2019 U.S. Dist. LEXIS 111051, *2–3 (D. Neb. July 3, 2019) (held as matter of discretion). However, the Department's views the plain language of the First Step Act to allow an inmate to file a motion after 30 days have passed since the request was made to the warden, *or* after exhausting administrative review, *whichever is earlier*. *See* First Step Act of 2018, 115 P.L. 391, § 603(b)(1); *United States v. Gray*, 416 F. Supp. 3d 784, 787–88 (S.D. Ind. Sept. 20, 2019); *United States v.*

Once either the exhaustion or lapse requirement is met, a court may reduce a defendant's term of imprisonment after considering whether the 18 U.S.C. § 3553(a) factors weigh in favor of release. *See* 18 U.S.C. § 3582(c)(1)(A); USSG §1B1.13. Reductions may be granted if (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." Section 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Heromin*, 8:11-cr-550-T-33SPF, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (J. Covington); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (holding that a movant for a reduction under § 3582(c)(2) bears the burden to establish a reduction is warranted).

The defendant's BOP record reflects that he submitted a Reduction in Sentence Application on October 17, 2020. (Ex. C.[7]) The Warden denied the application on October 30, 2020. (Ex. D.) Fewer than 30 days from the BOP's receipt of the defendant's original application passed before he filed the instant motion; accordingly, the lapse requirement is not met.

---

*Gardner*, 2020 WL 1673315, at *1 (D. Minn. Apr. 6, 2020).

[7] The defendant's administrative remedies log is attached as Ex. A. Although the defendant's RIS request was not listed there, BOP furnished a copy of his request and subsequent denial (*see* Exs. C and D).

The failure to have exhausted administrative remedies within the BOP is fatal to a defendant's motion for compassionate release. *United States v. Raia*, 954 F. 3d 594, 597 (3rd Cir. 2020) (published) (per curiam) ("Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance."); *see also United States v. Estrada Elias*, No. 6:06-096-DCR, 2019 WL 2193856, at *2 (E.D. Ky. May 21, 2019); *accord United States v. Elgin*, Case No. 2:14-cr-129-JVB-JEM, 2019 U.S. Dist. LEXIS 86571, *2–3 (N.D. Ind. May 23, 2019); *cf. United States v. Leverette*, 721 F. App'x 916, 917 (11th Cir. 2018) (exhaustion of BOP remedies is requisite for judicial review under 28 U.S.C. § 2241); *United States v. Roberson*, 746 F. App'x 883, 885 (11th Cir. 2018) (same); *United States v. Alexander*, 609 F.3d 1250, 1260 (11th Cir. 2010) (same). The vast majority of district courts to address this issue agree. *See, e.g.*, *United States v. Epstein*, 2020 WL 1808616 (D.N.J. Apr. 9, 2020) (citing numerous cases). Because the defendant has failed to exhaust his administrative remedies, his motion should be denied on that basis alone.

## VI. The defendant has not identified extraordinary and compelling reasons for compassionate release.

In any event, the defendant's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that

"extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG §1B1.13, comment. n.1(A). Potential COVID-19 exposure is not an extraordinary and compelling reason to grant release under any circumstances.

To state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that a condition that falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG §1B1.13, comment. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), the motion must be denied.

There is no indication yet that the defendant's condition (whatever it may be) is terminal. All that the defendant has presented to the Court is an opinion from a doctor that the defendant "has a very high likelihood of having cancer of the colon with likely metastasis to the liver." (Doc. 77-2.) An October 8,

2020 BOP medical record indicates that the defendant has "liver lesions highly suspicious for metastatic disease and should be considered as such until proven otherwise." (Ex. B at 1.) But to date, no one has determined that the defendant's condition is terminal. Moreover, the defendant has not made a showing that his condition impacts his ability to provide self-care in prison.

In addition, the mere existence of the COVID-19 pandemic—which poses a general threat to every non-immune person in the country—does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 954 F.3d at 597; *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).")).[8] To classify COVID-19 as an

[8] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the

extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to the BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

Here, the defendant contracted COVID-19 in July 2020 and evidently successfully underwent isolation and treatment in the institution. (Ex. B at 7.) Prematurely releasing the defendant will not provide him the protection sought by his relief from the risk of contracting COVID-19. *See United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, at *8 (S.D.N.Y. Apr. 14, 2020) (denying compassionate release to COVID-19 positive defendant where BOP is properly treating condition).

---

mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

## VII. Even if the defendant could establish an extraordinary and compelling reason for compassionate release, the applicable § 3553(a) factors strongly weigh against granting him compassionate release.

Furthermore, setting COVID-19 concerns aside, this Court must deny release unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG §1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). The defendant has not met his burden of establishing eligibility, and the § 3553(a) factors strongly weigh against granting compassionate release.

The defendant would pose a danger to public safety if released. This Court should deny a sentence reduction on that basis alone. In addition, the same analysis of 18 U.S.C. § 3553(a) factors that the Court applied to the defendant at sentencing remain applicable today. The nature and circumstances of the defendant's offense (which included online distribution and extensive possession of scores of child sex abuse images and videos) and sexual interest in underage girls render him an ongoing danger to the community.

In sum, this Court should deny the defendant's motion for compassionate release based on his failure to exhaust administrative remedies or meet the lapse requirement. And if this Court were to consider the merits of the defendant's motion, it fails there, too. First, the defendant has not

established that "extraordinary and compelling reasons" support a sentence reduction; second, the defendant has not met his burden to show that a reduction is warranted in light of the danger that the defendant would pose to the community and the relevant § 3553(a) factors.

**CONCLUSION**

For the foregoing reasons, this Court should deny the defendant's motion for compassionate release or home confinement based on his suspected cancer diagnosis and COVID-19.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By: */s/ Emily C. L. Chang*
EMILY C. L. CHANG
Assistant United States Attorney
USA No. 166
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone: 407-648-7500
Facsimile: 407-648-7643
E-mail: emily.chang@usdoj.gov

**U.S. v. BARDELL** **Case No. 6:11-cr-401-Orl-37DAB**

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Kimberly L. Copeland, Esquire

*/s/ Emily C. L. Chang*
EMILY C. L. CHANG
Assistant United States Attorney
USA No. 166
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone: 407-648-7500
Facsimile: 407-648-7643
E-mail: emily.chang@usdoj.gov