**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

UNITED STATES OF AMERICA,

v.                                          CASE NO. 6:11-cr-401-RBD-EJK

FREDERICK MERVIN BARDELL,

   Defendant.

_____

## SPECIAL MASTER'S VERIFIED EXECUTIVE SUMMARY

The Special Master has prepared a report containing recommendations to the Court in connection with its prosecution of contempt proceedings against the Federal Bureau of Prisons and Kristi Zook, the former warden of the Federal Correctional Institute in Seagoville, Texas ("FCI Seagoville"). The Court initiated these contempt proceedings in response to its discovery that BOP employees at FCI Seagoville failed to comply with a condition in its Order granting Defendant Frederick Mervin Bardell's ("Mr. Bardell") second motion for compassionate release ("Release Order"). This condition required BOP to release Mr. Bardell *after* the United States Probation Office ("Probation") approved a compliant plan of release developed in coordination with Mr. Bardell's former counsel, Kimberly Copeland ("Approval Condition"). The Approval Condition was not followed, and Mr. Bardell was released before a release plan was approved by Probation.

1

In addition, Mr. Bardell died nine days after his release from FCI Seagoville. The circumstances of his release necessitated judicial scrutiny.

Pursuant to the Court's Order appointing him Special Master, the undersigned was charged with: (1) investigating the circumstances of Mr. Bardell's release; (2) prosecuting contempt proceedings on behalf of the Court; (3) determining whether BOP and/or Warden Zook should be held in contempt for violating the Release Order; (4) advising on the imposition of sanctions; and (5) preparing a report containing recommendations to the Court on how to proceed. (Doc. 111, p. 2.) The executive summary, which accompanies the undersigned's more fulsome report, provides a concise overview of the Special Master's investigation, his ultimate findings of fact, and his corresponding conclusions of law.

## I.     THE INVESTIGATION

The Special Master used the following fact-gathering tools in conducting his investigation: witness interviews, depositions, informal requests for document production, and research based on publicly available documents. Contemporaneous notes were taken of the witness interviews.[1] The Special Master interviewed:

---

[1] Throughout this report, the Special Master has cited to deposition transcripts, where applicable, and provided a summary of witness statements made during investigative interviews. The Special Master has verified this executive summary and report, attesting to the truthfulness and accuracy of all such statements, to the best of his knowledge and recollection.

Ms. Copeland and her legal assistant; Mr. Bardell's parents and brother; five current and former Probation officers; four doctors, including two who submitted affidavits in support of Mr. Bardell's motion for compassionate release and two who treated him at Baptist Health in Jacksonville following his release; a retired supervisory correctional systems specialist at the Federal Correctional Complex at Coleman; two government attorneys; and the regional medical director for BOP's South-Central region. In addition, the Special Master deposed 13 BOP employees.

## II.    TREATMENT OF PRIVILEGED MATERIAL

The undersigned has been sensitive to issues of attorney-client privilege that have arisen during his investigation. In order to conduct a robust investigation without compelling the parties to waive privilege, the Special Master entered an order governing the production of privileged information on April 29, 2022. (Doc. 128.) Pursuant to that order, the government produced a comprehensive privilege log during the investigation. The Special Master's report does not contain privileged information, and the Special Master was careful to avoid eliciting privileged responses during witness interviews and depositions.

## III.   FINDINGS OF FACT

Based on the undersigned's review of documents produced by the parties and witnesses, as well publicly available documents on BOP's website, witness statements made during investigative interviews and depositions, and the

3

undersigned's assessment of the witnesses' credibility during the same, the Special

Master makes the following findings of fact.

- The Approval Condition in the Release Order was lawful, clear, and unambiguous.

- The Approval Condition required BOP to wait to release Mr. Bardell until it received approval of a release plan from Probation.

- This condition was consistent with BOP policy and practices already in place at FCI Seagoville.

- BOP and Warden Zook had the ability to comply with the Release Order.

- FCI Seagoville employees responsible for carrying out release procedures provided one of three reasons for not complying with the Approval Condition: (1) they did not read the Release Order; (2) they did not heed the Approval Condition; or (3) they assumed that the Approval Condition had been met.

- The foregoing reasons demonstrate that the relevant employees did not make all reasonable efforts to comply with the Approval Condition.

- The actions of the FCI Seagoville employees grossly deviated from reasonable conduct.

- At the time of Mr. Bardell's release, Warden Zook had responsibility for administrative and organizational controls at FCI Seagoville, as well as the technical and administrative direction of subordinate employees.

- At the time of Mr. Bardell's release, Warden Zook had full authority and responsibility to carry out court orders directed to FCI Seagoville.

- Prior to Mr. Bardell's release, there was no system in place to ensure that FCI Seagoville employees complied with all conditions of judicial release orders.

- The subsequent remedial measures that Warden Zook implemented at FCI Seagoville were not put in place to prevent FCI Seagoville employees from failing to comply with future release orders but, rather, to avoid a finding of contempt and the imposition of sanctions in these proceedings.

- At the time of her deposition, Warden Zook was the warden at a different BOP facility, specifically the Federal Transfer Center in Oklahoma City, Oklahoma ("FTC Oklahoma City").

- At the time of her deposition, Warden Zook had not put procedures in place to ensure that she had oversight over compliance with release orders at FTC Oklahoma City.

- At the time of her deposition, Warden Zook did not have plans to incorporate the changes she made at FCI Seagoville at her new facility.

- BOP is responsible for transporting released inmates to the location where they will be residing. This responsibility includes payment for transportation.

- Because BOP did not want to pay for a non-contract flight for Mr. Bardell, FCI Seagoville employees asked Mr. Bardell's parents to pay for a commercial flight.

- If Mr. Bardell's parents had been unable to pay for and book his flight, BOP would have paid for a non-contract flight.

- BOP directed Mr. Bardell's parents to pay for his release transportation before receiving approval of a release plan from Probation.

- This direction did not comply with the Approval Condition in the Release Order.

- The cost of Mr. Bardell's flight on February 8, 2021, was $494.20.

- Mr. Bardell's parents incurred this cost due to actions taken by FCI Seagoville employees to authorize Mr. Bardell's release prior to satisfying the Approval Condition.

- Ms. Copeland had a telephone call with Mr. Bardell on the morning of his release.

- During this call, there was no expectation of a confidentiality because there were clearly marked signs around the phone stating that the call would be recorded.

- FCI Seagoville designates separate phones for unrecorded, privileged calls.

- On the call, Ms. Copeland agreed that BOP could book Mr. Bardell a commercial flight to Jacksonville so that he could leave FCI Seagoville on February 8, 2021, without incurring expenses for air ambulance transport.

- At the time she agreed, Ms. Copeland was unaware of the extent of Mr. Bardell's physical condition. She did not know how weak he was or how difficult it would be for him to travel on his own.

- The Probation officers who worked on Mr. Bardell's release plan knew that Mr. Bardell would be released to a hospital in Jacksonville.

- The Probation officers did not know that Ms. Copeland intended for Mr. Bardell to be transported to the hospital via air ambulance.

- Even if BOP had complied with the Approval Condition, Mr. Bardell may still have travelled to Jacksonville on a commercial flight.

- Two days before the Court issued the Release Order, FCI Seagoville diagnosed Mr. Bardell with cancer.

- FCI Seagoville employees who met with Mr. Bardell on the day of his release had the opportunity to observe his physical condition. That day, Mr. Bardell complained of weakness and asked to sit down during a meeting with the unit secretary. He later requested a wheelchair. He was pushed in a wheelchair to the receiving and discharge center at FCI Seagoville immediately before he left the facility.

- Once released, Mr. Bardell was driven to the Dallas Fort-Worth airport and left at the curb. He had to make his way through DFW and a connecting flight in Atlanta without any assistance. He was in a bloodied and soiled condition when he arrived in Jacksonville.

- FCI Seagoville employees provided Mr. Bardell with a flight, rather than bus transportation, because of the distance to be traveled and in response to concerns communicated by Mr. Bardell's mother regarding his health.

- FCI Seagoville employees did not consider whether any other assistance should have been provided to Mr. Bardell in light of his physical and medical condition.

- Most of the FCI Seagoville employees who processed Mr. Bardell's release were unaware of his medical condition because they did not read the Release Order.

- The costs and expenses of the Special Master's investigation would not have been incurred if BOP and Warden Zook made all reasonable efforts to comply with the Release Order.

## IV.   CONCLUSIONS OF LAW

In view of the foregoing findings of fact, and the Special Master's analysis of controlling and persuasive authority, the Special Master reaches the following conclusions of law in his report.

- The actions of BOP and the Warden satisfy the elements of a civil contempt finding.

- BOP did not make all reasonable efforts to comply with the Release Order.

6

- Warden Zook did not make all reasonable efforts to comply with the Release Order.

- BOP and Warden Zook should be held in civil contempt for violating the Release Order.

- Warden Zook should be held in civil contempt in her official capacity.

- Compensatory sanctions against BOP are warranted.

- In determining whether to impose compensatory sanctions, the Court is not required to consider whether BOP or Warden Zook's actions were willful.

- Even if the Court was required to consider scienter in imposing sanctions, the recklessness of FCI Seagoville employees would weigh in favor of imposing compensatory sanctions.

- In civil actions, the standard for willfulness includes recklessness.

- The actions of BOP and Warden Zook in failing to read the Release Order, take notice of the Approval Condition, or verify compliance with the Approval Condition were reckless.

- The subsequent remedial measures implemented by Warden Zook at FCI Seagoville do not weigh against the imposition of compensatory sanctions.

- The cost of Mr. Bardell's flight to Jacksonville may be properly compensated by the BOP as a contempt sanction.

- If the Court finds that Warden Zook should be held in contempt in her individual capacity, the cost of Mr. Bardell's flight to Jacksonville may be properly compensated by the Warden Zook as a contempt sanction.

- Any injury that stemmed from BOP's actions in causing Mr. Bardell to be dropped off at the curb at DFW without assistance and left to navigate a connecting flight through two busy airports cannot be appropriately compensated in the instant civil contempt proceeding because, by the afternoon of February 8, 2021, neither Ms. Copeland nor Probation intended to include air ambulance transport in Mr. Bardell's release plan. Accordingly, even if BOP and Warden Zook had complied with the Approval Condition, it is possible that Mr. Bardell would have still taken a commercial flight to Jacksonville.

- The Special Master's attorney fees and expenses may be properly compensated by BOP as a sanction.

/s/ A. Lee Bentley, III

7

## <u>SPECIAL MASTER'S VERIFIED REPORT AND RECOMMENDATIONS</u>

On January 27, 2022, an Order issued appointing the undersigned as Special Master to prosecute contempt proceedings on behalf of the Court. (Doc. 111 ("Appointment Order").) Based on the findings of its investigation, the Special Master recommends that the Court hold the Federal Bureau of Prisons and Warden Kristi Zook in civil contempt. In addition, the Special Master concludes that compensatory damages should be awarded to the Bardells in the amount of $494.20 and for the attorney fees and expenses incurred by the Special Master in prosecuting these contempt proceedings. The Court has already ordered the latter. (*See* Doc. 111, pp. 3–4.)

## I.    OVERVIEW

The instant report concerns the troubling circumstances surrounding the release of former inmate Frederick Mervin Bardell ("Mr. Bardell"). Mr. Bardell was adjudicated guilty for committing one count of distribution of child pornography on March 2, 2012. (Doc. 42.) He was initially sentenced to a term of imprisonment of 151 months. (Doc. 59.) On February 8, 2021, he was released from the Federal Correctional Institute in Seagoville, Texas ("FCI Seagoville"), pursuant to the Court's Order granting him compassionate release. (*See* Doc. 92 ("Release Order"); *see also* Doc. 93 (containing notice of Mr. Bardell's release).) As set forth in the Court's Release Order, and consistent with BOP policy, Mr. Bardell should not have been

0

released until *after* the United States Probation Office ("Probation") approved a compliant plan of release ("Approval Condition"). (*Id.* at 6.) The release plan contemplated by the Court differed from the ordinary release procedure followed by Mr. Bardell's housing unit in only one respect—the Court directed that the release plan be created as a coordinated effort between Probation and Mr. Bardell's attorney, Ms. Kimberly Copeland, rather than by Mr. Bardell and his case manager. (*See id*.) However, due to a series of failures by employees at FCI Seagoville to read the Release Order, note the special conditions, and follow its directives, Mr. Bardell was released before Probation approved a release plan.

The failure to comply with the Court's directives is alone sufficient for a finding of contempt. But the circumstances paint an even more unsettling picture. On the day of his release, Mr. Bardell had stage IV cancer, was visibly weak, and had to be pushed in a wheelchair to the receiving and discharge center at FCI Seagoville so that he could leave the facility. Despite this, BOP employees at FCI Seagoville almost uniformly failed to take *any* care to read the Release Order or recognize that it imposed an Approval Condition that altered standard release procedure. Instead, Mr. Bardell was released without approval from Probation. He was driven to the Dallas-Fort Worth International Airport, dropped off at the curb, and left to navigate a connecting flight through Atlanta. He arrived at his ultimate destination in Jacksonville, Florida, bloodied and soiled, consistent with symptoms of his illness, which included anal

1

bleeding and an inability to control his bowels. He had to be pushed off the plane in a wheelchair by a fellow passenger. And due to the blood and excrement on his person, his father had to lay a shirt down on the seat of Ms. Copeland's car so that Mr. Bardell could be driven to the hospital.

The Special Master's investigation revealed that FCI Seagoville employees had the ability to comply with the Approval Condition and, in fact, that it was their ordinary practice to wait for Probation to approve a supervised release plan form prior to releasing an inmate. Their failure to comply with the Approval Condition was reckless. Accordingly, because the employees' actions violated the clear directive in the Court's Release Order and demonstrated reckless disregard for both the Court's instruction and the health and safety of an inmate committed to their care, the Special Master recommends that BOP and Warden Zook be found in civil contempt. The Special Master concludes that sanctions in the form compensatory damages are appropriate to remedy the violation. The Special Master recommends that the Court impose sanctions on BOP: (1) first, in the amount of $494.20, for the cost of Mr. Bardell's flight to Jacksonville on the day of his release, which was coordinated by BOP employees in contravention of the Approval Condition in the Release Order; and (2) second, in the form of attorney fees paid to the undersigned for the prosecution of the instant contempt proceedings, as provided in the Appointment Order.

## II.   PROCEDURAL HISTORY

### A.   Release Order

On February 5, 2021, the Court issued the Release Order granting Mr. Bardell's second motion for compassionate release, over the government's objection. (Doc. 92.) Applying the considerations enumerated in 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, as well as U.S.S.G. § 1B1.13, the Order found that Mr. Bardell had demonstrated an extraordinary and compelling reason for release—namely, that he was suffering from a terminal illness: stage IV metastatic colon cancer. (*Id.* at 4– 5.) Aside from detailing the Court's findings concerning Mr. Bardell's illness, the Release Order reduced Mr. Bardell's sentence to time served and imposed certain conditions. (*Id.* at 5–6.) Relevant here are two specific conditions contained on page 6 of the Release Order. The first condition directed Mr. Bardell's counsel to work with Probation "to create an approved plan of release as quickly as possible." (*Id.* at 6.) The second—the Approval Condition—directed BOP "to release [Mr.] Bardell immediately after [Probation] approve[d] a release plan." (*Id.*) The first directive was followed; the second was not.

### B.   The Court's Discovery of the Violation and Subsequent Inquiry

Ms. Copeland informed the Court of BOP's violation of the Approval Condition on February 12, 2021. (Doc. 94.) The filing was styled as a joint status report from Ms. Copeland and Assistant United States Attorney Emily Chang (*Id.*)

3

Ms. Chang later told the Special Master during an investigative interview that Ms. Copeland had drafted it, and she had merely consented. (*See* Ex. A, Copeland-Chang Email concerning February 12, 2021 Joint Status Report.)

Ms. Copeland's revelation prompted the Court to issue an Order directing the then-Warden of FCI Seagoville[2] "to provide a detailed report of the circumstances of [Mr. Bardell's] discharge and an explanation of why the Court's [Release Order] was not followed." (Doc. 96 ("February 16, 2021 Order").) In response, Warden Zook produced a two-page letter apologizing for the institution's "failure to *fully* observe" the Release Order, deflecting responsibility to her staff, and characterizing the violation as a "misunderstanding" and misinterpretation. (Doc. 98-1 (emphasis added).) The letter also discussed corrective instruction given to staff responsible for processing inmate releases and referenced her implementation of "bolstered" routing procedures "to ensure thorough review" of future release orders. (*Id.*) In the intervening period between the Court's February 16, 2021 Order and the Warden's response, Mr. Bardell died.[3] (*See* Doc. 97.)

The Court then issued a second Order, this time directing the government to show cause why BOP should not be held in civil contempt or otherwise sanctioned for failing to obey the Release Order. (Doc. 99 ("April 13, 2021 Show Cause

---

[2] Warden Zook is no longer the warden at FCI Seagoville.
[3] Mr. Bardell died on February 17, 2021—nine days after his release. (*See* Docs. 93, 97.)

Order").) The Court also permitted Ms. Copeland to file a reply to the government's response. (*Id.* at 7.)

The government responded on May 18, 2021, setting forth additional details concerning the release procedures followed at FCI Seagoville on the day of Mr. Bardell's release, including the names of the staff members involved. (Doc. 106.) Its response was supported by a declaration from Warden Zook and voluminous exhibits, pursuant the Court's directive that it file Mr. Bardell's complete administrative file and all medical records in its possession. (*See* Docs. 106-2 to 106-13; *see also* Doc. 99, p. 7.)

In essence, the government argued that the lack of willfulness on the part of the FCI Seagoville employees involved in Mr. Bardell's release prevented both a finding of criminal contempt and the imposition of sanctions under the Court's inherent power. (Doc. 106.) The government also argued that the absence of willfulness counseled against the imposition of compensatory sanctions, as did subsequent remedial measures implemented at FCI Seagoville to prevent reoccurrence of the violation. (*Id.*)

Ms. Copeland's reply, in contrast, argued that the Court, acting *sua sponte*, could not impose contempt sanctions but instead could act under its inherent power. (Doc. 107.) The exhibits to Ms. Copeland's reply included: (1) letters of administration identifying Mr. Bardell's parents, Craig and Charlotte Bardell, as

co-personal representatives of his estate (Doc. 107-1); an affidavit from Mr. Bardell's mother, Charlotte Bardell (Doc. 107-2); Ms. Copeland's correspondence with Angel MedFlight ("Angel Air"), confirming receipt of her request for medical air transport (Docs. 107-3 to 107-5); a picture of Mr. Bardell in the hospital following his release (Doc. 107-6); and correspondence from Mr. Bardell to his former fellow inmates relaying his prognosis—death in a matter of days (Doc.107-7).

Of note, the Court's April 13, 2021 Show Cause Order provided that, following receipt of the government's response, the Court would assess "the need for appointment of independent counsel to serve as amicus curiae on the development of a record and the question of sanctions." (Doc. 99, p. 8.) Ultimately, the Court appointed the undersigned to that role. (*See* Doc. 111.)

## C. Appointment of Special Master

After providing the parties with notice of its proposed choice and a period for objections (Doc. 109), on January 27, 2022, the Court issued the Order appointing the undersigned as Special Master to prosecute the instant contempt proceedings. (Doc. 111.) The Appointment Order set forth the following duties of the Special Master:

- Investigating the circumstances surrounding the release of Mr. Bardell;

- Investigating whether BOP reasonably attempted to comply with the Release Order;

- Determining whether BOP and/or Warden Kristi Zook should be held in contempt for violating the Release Order;

- Advising whether and what sanctions are warranted and against whom;

- Conferring with the parties regarding their positions on the above recommendations;

- Preparing a report containing recommendations to the Court on how to proceed; and

- Attending a hearing to discuss its recommendations and the parties' responses.

(*Id.* at 2–3.) The Appointment Order also provided the manner in which the Special Master was to be compensated for his work. (*Id.* at 3–4.) Consistent with the Appointment Order, the Special Master presents the following findings, conclusions, and recommendations.

## III.   INVESTIGATIVE FINDINGS

Pursuant to the Court's directives, the Special Master limited the scope of his investigation to occurrences *after* the issuance of the Release Order and not the circumstances surrounding the medical treatment—or lack thereof—that Mr. Bardell received *prior* to his release. The following sections contain: (1) the Special Master's consideration of select BOP policies, Probation's procedures relevant to the instant investigation, and FCI Seagoville's release practices and procedure; as well as (2) the Special Master's findings from pertinent statements and testimony of fact witnesses.

7

### A.      Relevant Policies, Practices, and Procedures

### 1.      BOP Policy concerning Supervised Release Plans

BOP Program Statement 5321.08, titled Unit Management Manual, contains

the following directives concerning a document known as a Supervised Release

Plan.

> Inmates have the responsibility to develop and submit to institution staff a release plan for investigation and verification by U.S. Probation staff in the district of their supervision. This is documented in both the Supervision Release Plan (BP-A0522) and the inmate's final Progress Report.
>
> . . .
>
> **Inmates Returning to their Sentencing District.** During final release planning, at least 90 days before a scheduled release directly to the community or at the time of referral to an RRC[4], staff forward a Progress Report and Supervised Release Plan to the [Probation] staff in the district of supervision for verification of residence and employment.

(Ex. B, Unit Management Manual, p. 6.)

The Supervision Release Plan (Form AP-0522) contains an area for the inmate

to add his or her post-release residence and employment plans, including: (1) a

proposed residence address, the person with whom the inmate will reside, that

person's relationship to the inmate, and a phone number; and (2) the company where

---

[4] An RRC is a Residential Reentry Center, otherwise described as a halfway house.

the inmate will work and the supervisor's name, the employment address and phone number, and the nature of the business. (Ex. C, Blank Supervision Release Plan Form.) In addition, the form contains an acknowledgement: (1) that the inmate submits this information as "plans for the service of the remainder of [his or her] sentence under supervision"; and (2) of the requirement that the inmate report in person to the Probation Office within 72 hours of release. (*Id.*)

Finally, the Supervision Release Plan form also contains a section that is completed by institution staff. (*Id.*) There, prison staff can complete information about the inmate's sentencing district, relocation district, detainers, special conditions, and remarks concerning release. (*Id.*) The form is signed by the inmate, the case manager, and the unit manager. (*Id.*) At the bottom, the form provides that the institution will keep a record copy, that Probation will receive a copy, and that the inmate will also receive a copy. (*Id.*)

### 2.    Probation's Procedure concerning Release Plans

During its investigation, the Special Master interviewed several individuals from Probation, including Senior U.S. Probation Officer Jackie Boughner, Senior U.S. Probation Officer Joseph Pinto, U.S. Probation Officer Nicholas Shea, retired Supervisory U.S. Probation Officer David Lubinski, and Deputy Chief U.S. Probation Officer DeCarlos Sheppard. These interviews took place by video conference. As with other fact witnesses, the Special Master had an opportunity to

observe these individuals and found their statements to be both credible and consistent.

Deputy Chief Sheppard provided an overview of the typical procedure surrounding Probation's receipt of, and action on, a release plan, which was corroborated by Ms. Boughner, Mr. Pinto, Mr. Shea, and Mr. Lubinski. At bottom, Probation's practice is to ensure the appropriateness of an inmate's post-release residence. Ordinarily, the release plan is provided to Probation by the inmate's case manager at the prison and contains a proposed release address for the inmate and the individuals that the inmate will be residing with. The release plan is investigated by the assigned probation officer who meets with the individuals listed to explain the conditions and restrictions of the inmate's supervised release, applicable registration requirements, as well as the probation officer's role and expectations. If the inmate is a sex offender, the probation officer also contacts local law enforcement. Probation ordinarily has 30 days to complete its investigation of the proposed release plan. In an expedited circumstance, such as a compassionate release, the investigation is typically accomplished in a day or two.

The findings of the investigation are then submitted to a supervisor, who either approves or denies the release plan. Following a decision, the probation officer contacts the inmate's case manager, noting completion of the investigation and the approval decision. If approval is denied, a secondary proposed residence must be

submitted. Mr. Lubinski offered that the immediacy and truncated timeline of compassionate releases likely leads to skipping steps.

For compassionate releases based on medical reasons, probation officers are encouraged to touch base with the prosecutor and the inmate's attorney. Medical releases also sometimes involve contacting the hospital to which the inmate is being released. Probation also considers whether the inmate needs special services.

Release plans for sex offenders are conducted by more experienced officers. Here, Boughner had 14 to 15 years' experience, while Pinto had 25 years' experience. According to Mr. Lubinski, it is a "a known quantity" that there must be an approved address for sex offenders. In such a scenario, BOP is expected to contact the Probation Office before releasing an inmate so that Probation can approve the residence. In the absence of approval from Probation, a sex offender may be subject to arrest for occupying a residence in violation of a local ordinance or other residency restriction.

Probation's investigation of Mr. Bardell's release plan differed from its ordinary practice because it was initiated based on information from Mr. Bardell's attorney and the Release Order, rather than the inmate's case manager at BOP. While it is not common for a court to order an approved release plan, it is consistent with Probation's expectation that information concerning an inmate's release will be provided in advance of an inmate's release.

11

Mr. Shea was aware of no circumstance in which BOP may release an inmate before a release plan is approved by Probation. However, the probation officers were aware that BOP does not wait for Probation to approve a release plan if an inmate's sentence has expired by virtue of a time-served order. Others had experienced instances in which BOP failed to wait for Probation's approval before releasing an inmate where an inmate's sentence had not been terminated by a time-served order. Mr. Sheppard shared that he had received complaints of this occurring in the past and that the explanation from BOP was usually that "it slipped through the cracks." Mr. Sheppard stated that probation officers have also complained about not receiving appropriate notification from BOP prior to an inmate's release. According to Mr. Sheppard, Probation's typical response in such a scenario is to contact the warden. Mr. Sheppard recalled one instance that occurred two or three years ago, in which an assistant deputy at Probation had to initiate a conversation with a warden concerning BOP's failure to wait for approval before release. In that scenario, BOP apologized to Probation.

Mr. Sheppard believed that a case manager would only receive written notice in such a scenario if the failure to wait for Probation's approval was egregious. He recalled a recent occurrence in which Probation had experienced problems communicating with a case manager. On that occasion, when Probation initiated its investigation of the proposed release address, the inmate was already living there. In

12

Mr. Sheppard's view, releasing an inmate without an approved release plan from Probation is problematic. He expressed that giving Probation the opportunity to correctly vet a release plan is in the best interest of the community.

Mr. Lubinski corroborated Mr. Sheppard's statements. He stated that while best practice is for BOP to coordinate with Probation before releasing an inmate, it does not always happen. He also shared that BOP does not always contact Probation for approval of a release address for a sex offender.

### 3.     Release Plans Contemplated for Compassionate Release

BOP Program Statement 5050.50, entitled Compassionate Release/Reduction in Sentence Procedures for Implementation of 18 U.S.C. § 3582 and 4205(g), also contains references to release planning, as do 28 C.F.R. §§ 571.61 and 571.62.

This Program Statement lists an inmate's release plans, including employment, medical, and financial circumstances, as factors for BOP to consider in connection with an administrative request for reduction in sentence. (Ex. D, Compassionate Release/RIS Procedures, p. 12.) In initiating an administrative request for a reduction in sentence based on extraordinary or compelling circumstances, an inmate's request must include:

> [p]roposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment.

13

28 C.F.R. § 571.61(a)(2).

If a warden approves an administrative request for compassionate release or reduction in sentence, he or she must refer the matter in writing with a recommendation to the Office of General Counsel. 28 C.F.R. § 571.62(a)(1). As it relates to a release plan, the Warden's referral must include the following:

> g. For a request under 18 U.S.C. § 3582(c)(1)(A), when a term of supervised release follows the term of imprisonment, *confirmation that release plans have been approved by the appropriate U.S. Probation Office must be included in the referral*. If the inmate will be released to an area outside the sentencing district, the U.S. Probation Office assuming supervision must be contacted. If no supervision follows the term of imprisonment, release plans must still be developed.
>
> h. The development of release plans must include, at a minimum, a place of residence and the method of financial support[] and may require coordination with various segments of the community, such as hospices, the Department of Veterans Affairs or veterans' groups, Social Security Administration, welfare agencies, local medical organizations, or the inmate's family.

(Ex. D., Compassionate Release/RIS Procedures, at 13–14 (emphasis added).)

As the policies, procedures, and practices above show, a requirement that Probation approve a release plan prior to BOP releasing an inmate is not new.

**B.      Statements and Testimony of Fact Witnesses**

     **1.      Coordination between Ms. Copeland and Probation to Create Release Plan**

In oncologist Dr. Judy L. Schmidt's initial affidavit dated February 1, 2021, filed in support of Mr. Bardell's second motion for compassionate release, she opined that Mr. Bardell "should be referred to an institution like M.D. Anderson or the Mayo Clinic by air ambulance ASAP." (Doc. 86-1, p. 2, ¶ 22). Pursuant this recommendation, in January of 2021, Ms. Copeland began coordinating release transportation for Mr. Bardell by air ambulance in anticipation of the Court's Release Order.

  Ms. Copeland assigned her law clerk, David Roberson, to determine whether Mr. Bardell could be transported by air ambulance if he was released. To this end, Mr. Roberson contacted Angel Air regarding the pricing and logistics of picking Mr. Bardell up from FCI Seagoville. Mr. Roberson passed on the information to Ms. Copeland, who arranged for Angel Air to be on standby once Mr. Bardell was processed by the institution. Mr. Roberson understood that the flight would have a registered nurse on board to transport Mr. Bardell to the hospital.

After the Court issued the Release Order, Ms. Copeland immediately contacted Probation to begin working on a release plan. She initially contacted the wrong probation office. Consequently, she did not get in touch with the Cocoa Beach Probation Office until close to 5 p.m. on Friday, February 5, 2021.

That day, Mr. Shea was the duty officer. During his call with Ms. Copeland, she notified him of the Release Order and informed him that Mr. Bardell had stage IV cancer and would need to go directly to the Mayo Clinic for treatment following his release.[5] Ms. Copeland also informed Mr. Shea that she was trying to arrange a flight to the Jacksonville area, but he understood this to be by commercial plane. Mr. Shea did not recall Ms. Copeland stating that she was arranging medical transport, but he did not dispute it.

Mr. Shea relayed the information from Ms. Copeland to his supervisor, Mr. Lubinski, along with the Release Order. (Ex. E, Shea-Lubinki-Boughner Email Chain concerning Release Order, p. 2.)  Mr. Shea later read the Release Order. He understood that it stated that Mr. Bardell should be released upon Probation approving a release plan.

Mr. Lubinski was not working on the day the Release Order issued. He reviewed Mr. Shea's email on Saturday, February 6, 2021, and subsequently read the Release Order. He assigned the case to senior officer Ms. Boughner, via email, the same day. In his interview with the Special Master, Mr. Lubinski explained that he assigned the case on a Saturday due to the urgency of getting Mr. Bardell to the hospital quickly. He remembered Mr. Bardell's case because it was so high priority.

_____

[5] At the time, Probation believed that Mr. Bardell would be released to the Mayo Clinic in Jacksonville. Mr. Bardell was ultimately admitted to Baptist MD Anderson Cancer Center in Jacksonville.

Ms. Boughner did not see the email assigning her to the case until Monday morning on February 8, 2021. She read the Release Order and understood that Mr. Bardell could not be released until Probation approved his release address. Ms. Boughner also took note of the directives that Mr. Bardell comply with the sex offender registration act and that Probation work with his counsel to create an approved plan of release. Also aware of the urgency, Ms. Boughner immediately began her investigation into the suitability of Mr. Bardell's proposed release address—the home he owned in New Smyrna Beach. Mr. Bardell had planned to return to his home following treatment at a cancer center.

Ms. Boughner received a response from the Volusia County Sherriff's Office around 9:30 a.m. on February 8, 2021, indicating that Mr. Bardell could not live in his home because it was within 2,500 feet of a daycare and a school, in violation of a local ordinance governing residency restrictions for sex offenders. (*See* Ex. F, Boughner-VCSO Email Chain.) At Ms. Copeland's request, Probation attempted to work with the Volusia County' Sheriff's Office to determine whether Mr. Bardell could be grandfathered into his home, given that he had been released there during pretrial proceedings. Ms. Boughner was unsuccessful. She relayed this to Mr. Lubinski.

In the interim, Mr. Lubinski had spoken to Mr. Roberson around 10 a.m. that morning. Mr. Roberson informed Mr. Lubinski that, due to the advanced stage of

17

Mr. Bardell's colon cancer, the priority was to get Mr. Bardell to the Mayo Clinic for treatment. Mr. Lubinski did not discuss the method of transport with Mr. Roberson.

Around 11:20 a.m., Ms. Boughner spoke to Mr. Roberson, who suggested that Probation use the address of the hospital in Jacksonville to which Mr. Bardell would be released as his release address. Ms. Boughner felt this was a good idea. She did not speak to anyone about Mr. Bardell's transportation to the hospital.

Because of the new release address, Mr. Lubinski contacted Crystal Di Leva, the supervisory U.S. probation officer in the Jacksonville office. (Ex. G, Email from Lubinksi to Di Leva concerning Bardell.) The case was then assigned to Mr. Pinto. Ms. Boughner had no further involvement after that point.

Mr. Pinto read the Release Order when he received it and began working to communicate with Ms. Copeland about the release plan. Mr. Pinto understood that the plan was to get Mr. Bardell to the hospital. He expressed that Ms. Copeland "was great and did all the leg work." In doing so, Ms. Copeland enlisted the assistance of Dr. Celio Burrowes, who helped get Mr. Bardell admitted to the emergency room at Baptist Medical Center in Jacksonville.[6] Ms. Copeland felt that Probation was

---

[6] Baptist Health is a non-profit health system comprising numerous components. Mr. Bardell was initially admitted to the emergency room at Baptist Medical Center in Jacksonville on February 9, 2021. He was later seen by physicians at the affiliated Baptist MD Anderson Cancer Center, which is also in Jacksonville.

working quickly to approve the release plan and that it would have been in place that Monday. She believes that she told Probation about her arrangements for medical air transport.

Mr. Pinto was ready to confirm the release plan with the hospital when he received a call from Ms. Copeland informing him that BOP had already released Mr. Bardell. He was surprised that Mr. Bardell had been released without Probation's approval. Mr. Pinto did not speak to Ms. Copeland about any medical transport.

Because of his premature release, Mr. Bardell's release plan was never fully vetted. None of the probation officers involved in Mr. Bardell's release recall receiving a release plan or any communication from BOP. According to Mr. Sheppard, Probation has no record that BOP sent notification of Mr. Bardell's release in its records.[7]

---

[7] Probation's statements contradict an email previously filed by the government from FCI Seagoville case manager Randolph King to "FLMP_Orlando_BOP@flmp.uscourts.gov" on February 8, 2021, informing the recipient that Mr. Bardell had been granted compassionate release and was releasing to the Middle District of Florida that day. (Doc. 106-3, p. 40.) Mr. King appears to have attached Mr. Bardell's Prisoner Release Notification form to the email. (*Id.* at 40-42.) This document is distinct from the Supervised Release Plan form discussed earlier in this report.

### 2. Conversations with Mr. Bardell concerning the Release Plan

On the morning of his release, Ms. Copeland received a call from Mr. Bardell around 11:30 a.m. This conversation was recorded and took place in a phone booth that, according to BOP's attorney liaison, contained visible warnings that the phone call would be recorded.[8] Accordingly, BOP's position is that the call was not protected by attorney-client privilege. During the phone call, Ms. Copeland informed Mr. Bardell that arrangements were being made to pick him up from FCI Seagoville by air ambulance. Mr. Bardell told Ms. Copeland, however, that BOP was arranging a commercial flight for him. Initially, Ms. Copeland told Mr. Bardell that she could arrange faster transportation, but eventually she acquiesced to BOP booking a flight for Mr. Bardell on the grounds that it would avoid the expense of medical air transport. Ms. Copeland tried to conference Mr. Bardell's parents in on the call. Though she was unsuccessful, she can be heard advising his parents that BOP would fly him to Jacksonville that day.

When asked about the call during an interview with the Special Master, Ms. Copeland stated that she was unaware of the extent of Mr. Bardell's physical condition and did not know how weak he was or how difficult it would be for him to

---

[8] The government referenced this audio recording in its motion for an extension of time to respond to the Court's April 13, 2021 Show Cause Order. (Doc. 100, p. 2.) Consistent with Local Rule 3.07, the Special Master will provide the Court with a copy of the audio recording via email and disk.

travel on his own. She assumed that, since BOP saw it fit to book him a flight, then he must have been healthy enough to travel by commercial flight.

### 3. Conversations with Mr. Bardell's Parents concerning Release Plan

Ms. Copeland conveyed the information gathered by Mr. Roberson about the price and logistics of medical air transport to Mr. Bardell's parents. The cost was about $18,000. The Bardells were willing to pay for the transport.

Despite this, Charlotte Bardell received a call from an FCI Seagoville employee on February 8, 2021, asking if she would pay for a commercial flight. Charlotte Bardell was surprised by the call because she believed that Ms. Copeland had arranged medical air transport for Mr. Bardell via Angel Air. In her surprise, Charlotte Bardell did not mention the planned medical air transport. According to Charlotte Bardell, she felt pressured to pay for the plane ticket because the employee expressed that they wanted to "get [Mr. Bardell] out of [there] immediately"—a point she said was repeatedly stressed during the call. (*See* Doc. 107-2, p. 2; *see also* Ex H, Mays Dep. 13:17–23.) Charlotte Bardell later called Ms. Copeland to inform her that BOP would be releasing Mr. Bardell and had booked him a flight.

### 4. Conversations with FCI Seagoville concerning Release

Ms. Copeland called Mr. Bardell's case manager at FCI Seagoville, Kendrick Hollins, on Friday, February 5, 2021—the day the Release Order issued. According to

Ms. Copeland, she informed Mr. Hollins about the Release Order and told him that she would be sending a flight to pick Mr. Bardell up.

Ms. Copeland described the events on the day of Mr. Bardell's release as a "rush." She was unable to speak to any of the FCI Seagoville employees until after Mr. Bardell's release. At that point, she was informed that he had already been taken to the airport.

### 5.    Release Procedure at FCI Seagoville

### General Procedures

Compassionate release procedures at FCI Seagoville typically involve the Designation and Sentence Computation Center (DSCC), located centrally in Grand Prairie, Texas, as well as the correctional systems team, unit team, assistant case management coordinator (ACMC), and case management coordinator (CMC). FCI Seagoville employees employ general routing procedures with respect to release paperwork. When the institution receives a release order, the correctional systems team performs its own verification procedure and also sends it to DSCC for verification. (Ex. I, Burnham Dep. 8:10–16, 6:11–12.). DSCC then verifies the legitimacy of the release order by pulling the order from PACER. (Ex. J, Noonkester Dep. 12:3–6.) Once the institution receives the verified release order, it is routed to the unit team. (*See* Kennedy Dep. 46:14–18.)

The unit team consists of a unit manager, unit secretary, case manager, and counselor assigned to a housing unit at FCI Seagoville. (Ex. K, Evans Dep. 8: 3–10.) Upon receipt of the verified release order, the unit team advises the inmate that he is being released and allows the inmate to contact his family. (*Id.* 13:7–9, 12:19–22.) The unit team then begins completing the release paperwork. (*Id.* 13:20–21.) As part of this process, the case manager meets with the inmate concerning his release address. (Ex. L, Kennedy Dep. 20:22–21:24.) This information is used to complete the Supervised Release Plan form. (*Id.*) The form must be approved by Probation so that the inmate does not release homeless. (*See* Ex. K, Evans Dep. 20:22–21:5, 31:2–8; *see also* King Dep. 17:10–11 ("Our practice is that sex offenders do not release homeless.").)

A separate form, the Prisoner Notification Release form, is completed upon the release of sex offenders, drug offenders, and violent offenders who must serve a term of supervised release.[9] (Ex. L, Kennedy Dep. 13:24–14:2.) The Prisoner Notification Release form is first presented to the Warden for signature (Ex. K, Evans Dep. 16:24–17:3) and then routed through the unit team with the remaining release paperwork (Ex. H, Mays Dep. 23:6–11). The release paperwork is completed by the case manager and reviewed by the unit manager, the ACMC, and the CMC.

---

[9] At times during their depositions, BOP employees referred to the Prisoner Release Notification form as the "VCCLEA" form, an acronym for the Violent Crime Control and Law Enforcement Act of 1994.

23

(Ex. L, Kennedy Dep. 37:10–14; *see also* Ex. H, Mays Dep. 23:6–11.) It is then routed to the supervisory correctional systems specialist, who signs the release authorization form and routes the release packet to the receiving and discharge center. (Ex. I, Burnham Dep. 9:10–10:3.) A routing slip accompanies the paperwork to document the sequence of departments that receive the release paperwork. (Ex. M, Example Routing Slip.) The government's attorney liaison could not locate the specific routing slip accompanying Mr. Bardell's release paperwork on the day of his release.

During the release process, transportation arrangements for a releasing inmate at FCI Seagoville are made by the unit secretary, and flights must be approved by the CMC. (Ex. K, Evans Dep. 36:17–24; Ex. H, Mays Dep. 6:7–22.) Once the arrangements are made, the inmate is sent to the receiving and discharge center where his identify is verified and he receives a 30-day supply of any medications he is taking. (*See* Ex. L, Kennedy Dep. 47:1–5, 67:18–20; *see also* Ex. I, Burnham Dep. 12:19–22.) The inmate is then physically released from the facility. (Ex. L, Kennedy Dep. 61:4–9.)

Dr. Ballom, whom the government produced for an interview as someone with knowledge concerning the role of the Health Services Division ("HSD") during release procedures at FCI Seagoville, stated that HSD's only involvement consists of notification of an inmate's release, completion of a medical exit summary, and

providing the inmate with a 30 to 90-day supply of any medication taken. According to Dr. Ballom, HSD is not expected to read compassionate release orders. Dr. Ballom stated the level of communication between HSD and non-medical staff at any given institution with respect to release transportation is dependent on "institution dynamics." With the exception of the supply of medication given to an inmate at discharge, none of the relevant employees had any real grasp of HSD's involvement in release procedures at FCI Seagoville. (*E.g.*, Ex. L, Kennedy Dep. 67:21–68:2; Ex. N, King Dep. 31:11–18.)

BOP attorneys do not ordinarily review release orders unless a staff member has a specific question. (*See* Ex. L, Kennedy Dep. 51:2–19.) At FCI Seagoville, staff typically direct such questions to BOP attorney Alicia Miller.[10] (Ex. R, Zook Dep. 60:17–61:9; Ex. U, Ruiz Dep. 43:5–19, 44:1–23.)

### Mr. Bardell's Release

On the day the Release Order issued, Mr. Hollins was a relatively inexperienced case manager. (Ex. O, Hollins Dep. 6: 16–20, 14:1–5.) He spoke to Ms. Copeland concerning the Release Order but expressed confusion about her plans

---

[10] On the day of Mr. Bardell's release, Ms. Miller was one of 17 recipients on an email from acting supervisory correctional systems specialist Jason Burnham circulating the Release Order. (Doc 106-3, p. 7.) The email was sent at 11:58 a.m. from FCI Seagoville's correctional systems' mailbox. (*Id.*) Ms. Miller was not asked to advise staff concerning the Release Order and did not take action on the Release Order with respect to the implementation of release procedures.

to arrange for a medical air flight to transport Mr. Bardell from FCI Seagoville to a hospital in Jacksonville. (*See id.* at 11:14–12:1.) After speaking to his supervisor, unit manager Tina Evans, Mr. Hollins began preparing Mr. Bardell's Prisoner Notification Release Form and emailed it to Ms. Evans. (*Id.* at 18:14–16, 28:9–18; *see also* Ex. P, Prisoner Notification Release Form.) This was the extent of his involvement in Mr. Bardell's release, as he was not working the following Monday. (Ex. O, Hollins Dep. 28: 19–20, 18:11–13.)

On the day of Mr. Bardell's release, Mr. King, another case manager in Mr. Bardell's housing unit, completed the Supervision Release Plan in Mr. Hollins' absence. (Ex. K, Evans Dep. 23: 16–22; Ex. Q, Mr. Bardell's Supervision Release Plan.) It was Mr. King's regular practice to wait for Probation's approval of a Supervision Release Plan prior to completing an inmate's release paperwork. (Ex. N, King Dep. 16:7–19:5.) According to Mr. King, it was CMC Rhonda Kennedy's practice to reject any release paperwork that did not contain written approval of a Supervision Release Plan by Probation for a sex offender. (*Id.* at 18:25–19:5) On the day of Mr. Bardell's release, however, Mr. King completed the Supervision Release Plan but never sent it to the Probation Office. (*See* Ex. N, King Dep. 23:9–25, 25:13–15.) He simply forgot. (*Id.* at 25:13–17; *see also id.* at 20:12–16.)

Nevertheless, the form was signed by Mr. Bardell, Mr. King, and Ms. Evans. (Ex. Q, Mr. Bardell's Supervision Release Plan.) Ms Evans, ACMC Stephanie Ruiz,

and CMC Kennedy each reviewed some portion of Mr. Bardell's release paperwork. (*See* Ex. K, Evans Dep. 31:12–22; Ex. U, Ruiz Transcript 21:18–21; Ex. L, Kennedy Dep. 33:17–22.) But they did not read—or did not remember reading—the Release Order. (Ex. L, Kennedy Dep. 41:21–42:10; Ex. K, Evans Dep. 19:25–20:1; Ex. H, Mays Dep. 16:23–17:10; Ex. N, King Dep. 20:24–21:4.) Ms. Kennedy, who had final sign off on the release paperwork (Evans Dep., 17:19–24), did not review the Supervision Release Plan. (Ex. L, Kennedy Dep. 33:4–22.) And despite the absence of an approval from Probation, she did not reject the release paperwork, per her usual practice. (Ex. N, King Dep. 18:25–19:5, 20:17–23.)

When Mr. Burnhman signed Mr. Bardell's Release Authorization form, he assumed that the inclusion of the Supervision Release Form in the release packet indicated that it had been approved by Probation. (Ex. I, Burnham Dep. 11:8–12:6, 27:17–28:14.)

Ms. Evans knew that Mr. Bardell was sick and recommended a commercial flight, over bus travel, for that reason. (*See* Ex. K, Evans Dep. 33:2–11, 44:24–45:4.) This recommendation was approved by Ms. Kennedy. (*Id.* at 37:2–16.) Despite being informed of Ms. Copeland's proposal for private airplane transportation by Mr. Hollins the prior Friday, Ms. Evans never contacted Mr. Bardell's counsel for

clarification.[11] Instead, she shared that she and Mr. Hollins found the proposal "a little funny." (Ex. K, Evans Dep. 27: 1–13, 22–25.) In any event, pursuant to Ms. Evans' recommendation, unit secretary Breanna Mays spoke to Mr. Bardell's parents by telephone and gave them instructions as to which flight to book after they agreed to pay. (*See* Ex. H, Mays Dep. 12:9–16; *see also* Ex. Y, Flight Receipt.)  The flight was $494.20. (Ex. Y, Flight Receipt.)

HSD did not play a role in determining Mr. Bardell's method of release transportation even though he had received an official cancer diagnoses on February 3, 2021—two days before the Court issued the Release Order.  (Ex. AA, Dr. Russell Email Confirming Colon Cancer Diagnosis on February 3, 2021; *see also* Doc. 106-4, pp. 1–5; *cf.* Ex. R, Zook Dep. 86:18–21 (acknowledging Mr. Bardell was diagnosed prior to his release).) An existing diagnosis was also detailed in the Court's Release Order. (*See* Doc. 92.) In addition, Ms. Evans, Ms. Mays, and Mr. King met with Mr. Bardell on the day of his release. (Ex. K, Evans Dep. 31:12–15, 16–19; Ex. H, Mays Dep. 11:15–12:13; Ex. N, King Dep. 27:8–19.) These employees were uniquely positioned to observe Mr. Bardell's physical condition at the time of his release. Indeed, while meeting with Ms. Mays on the day of his

---

[11] As evidenced by Mr. Bardell's administrative records, Ms. Copeland was his only approved visitor, and her contact information was present throughout numerous visitation requests in his records. (Doc. 106-9, pp. 3–25.)

release, Mr. Bardell complained of feeling weak and asked to sit down. (Ex. H, Mays Dep. 12:12–13, 14:12–15.) At Mr. Bardell's request, Ms. Mays later escorted him to the receiving and discharge center *in a wheelchair* for release. (*See* Ex. K, Evans Dep. 27:4–13, 29:8–11.) His medical records also show that, on February 3, 2021, he was approved for wheelchair use due to complaints of weakness. (Doc. 106-4, p. 10–12.) Despite the foregoing indications of poor health, weakness, and ambulatory difficulty, FCI Seagoville employees never notified HSD and did not provide Mr. Bardell with any type of accommodation to navigate the airport. Mr. Bardell was ultimately released without approval by Probation. He was not provided a wheelchair when he exited the facility.

### 6.    Aftermath of Release

Upon his release, a trustee-inmate, also referred to as a "town driver," drove Mr. Bardell to the DFW airport and dropped him off at the curb. According to Ms. Copeland, the town driver was not able to get out of the car to assist Mr. Bardell because he was a fellow federal prisoner. However, this restriction does not appear in the written policy for town drivers provided by the government. (*See* Ex. S, Inmate Town Driver Institution Supplement.)

Regardless, on the day of his release, Mr. Bardell was frail, had trouble walking, and was described as having a ball—that is, a tumor—wrapped around his stomach. Somehow, he navigated a connecting flight through Atlanta and arrived in

Jacksonville. After Mr. Bardell arrived at the airport, Charlotte and Craig Bardell watched a fellow passenger push their 54-year-old emaciated son off the airplane in a wheelchair. He could barely walk. They described Mr. Bardell as "a whittled old man with gray hair." Mr. Bardell was bleeding and had soiled himself, as he could not control his bowels. His parents explained that they could smell the discharge when he landed and that "it was bad." Before Mr. Bardell entered Ms. Copeland's car to be taken to the hospital, Craig Bardell placed his shirt on the car seat to absorb the excrement and blood covering his son. The significant emotional distress experienced by the Bardells by the foregoing encounter was readily apparent to the Special Master during the undersigned's interview with Craig and Charlotte Bardell, who described the account through tears.

Mr. Bardell was admitted to the emergency room at Baptist Medical Center in Jacksonville in the early hours of February 9, 2022. Mr. Pinto saw Mr. Bardell in the hospital the day after his release. He described Mr. Bardell as thin "skin and bones." Additionally, Mr. Pinto commented that Mr. Bardell looked like he was 76.

At the hospital, Mr. Bardell showed Mr. Pinto the large tumor on his stomach, which Mr. Pinto could see through the sheets. Mr. Pinto was also aware that Mr. Bardell had bled from abrasions in his rear and had five percent ambulatory ability. It was obvious to Mr. Pinto that Mr. Bardell did not have long to live. Because of his observations, Mr. Pinto felt that Mr. Bardell's skin was too frail for

a leg monitor and worried that it would cause abrasions. Mr. Pinto felt that there was no security need for a leg monitor due to Mr. Bardell's physical condition and requested permission from the Court to forgo a leg monitor, which the Court granted.

Mr. Bardell was later admitted to Baptist MD Anderson Cancer Center where he received palliative care. Ms. Copeland visited him often. He was never released from the hospital and passed away on February 17, 2021—nine days after his release from FCI Seagoville. (*See* Doc. 97.)

## IV.   LAW

### A.   Appointment, Duties, and Compensation of Special Master

The Court issued the Appointment Order pursuant to Rule 53 of the Federal Rules of Civil Procedure. Specifically, Rule 53(c) authorizes federal courts to appoint a master to perform duties consented to by the parties. The Rule also imposes due process requirements on the Court, including: (1) giving the parties "notice and an opportunity to be heard" prior to a master's appointment; and (2) requiring the master to file an affidavit disclosing whether there is any ground for disqualification under 28 U.S.C. § 455. Fed. R. Civ. P. 53(b)(1), (3).

In addition, an appointing order must direct the master to proceed with all reasonable diligence and state:

> (A) the master's duties, including any investigation or enforcement duties, and any limits on the master's authority under Rule 53(c);

31

(B) the circumstances, if any, in which the master may communicate ex parte with the court or a party;

(C) the nature of the materials to be preserved and filed as the record of the master's activities;

(D) the time limits, method of filing the record, other procedures, and standards for reviewing the master's orders, findings, and recommendations; and

(E) the basis, terms, and procedure for fixing the master's compensation under Rule 53(g).

Fed. R. Civ. P. 53(b)(2). Under this rule, a master may take all appropriate measures to perform the assigned duties fairly and efficiently. Fed. R. Civ. P. 53(c)(1)(B).

As relevant here, a master may be compensated by a party or the parties. Fed. R. Civ. P. 53(g)(2)(A). "[I]n appointing a master, the court must consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay." Fed. R. Civ. P. 53(a)(3). Ultimately, "[t]he court must allocate payment after considering the nature of and amount of the controversy, the parties' means, and the extent to which any party is more responsible than the other parties for the reference to the master." Fed. R. Civ. P. 53(g)(3).

## B.    Recommendation of Special Master and Review by Court

Under Rule 53(c)(2), an appointed master "may recommend a contempt sanction against a party and sanctions against a nonparty." In doing so, "[t]he master must report to the court as required by the appointing order." Fed. R. Civ. P. 53(e). Unless the court orders otherwise, "[t]he master must file the report and promptly serve a copy on each party." *Id.*  A master appointed under Rule 53 is also authorized

to issue orders. Fed. R. Civ. P. 53(d). "A master who issues an order must file and promptly serve a copy on each party. The clerk must enter the order on the docket." *Id.*

"In acting on a master's order, report, or recommendation, the court must give the parties notice and an opportunity to be heard; may receive evidence; and may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." Fed. R. Civ. P. 53(f). Parties may file objections to the master's order, report, or recommendations in the time set by the court. Fed. R. Civ. P. 53(f)(2). Alternatively, a party may move to adopt or modify the master's order, report, or recommendations. *Id.* Unless the parties stipulate otherwise, the court must decide de novo all objections to findings of fact and conclusions of law recommended by a master. Fed. R. Civ. P. 53(f)(4).

### C.      The Court's Contempt Power

Under 18 U.S.C. § 401,

> A court of the United States shall have the power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other as-- (1) [m]isbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; (2) [m]isbehavior of any of its officers in their official transactions; (3) [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command.

The contempt power set forth in 18 U.S.C. § 401 applies to both criminal and civil actions. *United States ex rel. Shell Oil Co. v. Barco Corp.*, 430 F.2d 998, 1000 (8th Cir. 1970). An alleged contemnor is entitled to notice and a reasonable time to prepare his defense in both civil and criminal contempt proceedings. *First Maryland Leasecorp. v. M/V Golden Egret*, 764 F.2d 749, 758 (11th Cir. 1985).

### 1.    Civil Contempt

To establish that a party acted in civil contempt, there must be clear and convincing evidence to demonstrate that that: (1) the allegedly violated order was valid and lawful, (2) the order was clear and unambiguous, and (3) the alleged violator had the ability to comply with the order. *United States v. Claudio*, 499 F. App'x 865, 867 (11th Cir. 2012) (citing *Ga. Power Co. v. Nat'l Labor Relations Bd.*, 484 F.3d 1288, 1291 (11th Cir. 2007)). In the civil context, "[t]here is no requirement that the contempt be 'willful,' nor is there any 'good faith' exception to the requirement of obedience to a court order." *Hugler v. Jasper Contractors, Inc.*, No. 1:16-cv-3845, 2017 WL 8186737, at *10 (N.D. Ga. June 8, 2017), *adopted by* 2017 WL 8186721 (N.D. Ga. July 24, 2017).

Ordinarily, a "civil contempt action is brought by a private party, not the court." *Wolfe v. Coleman*, 681 F.2d 1302, 1306 (11th Cir. 1982). However, district courts are afforded discretion in fashioning the procedure by which civil contempt sanctions are imposed, so long as they stay within the bounds of due process. *Mercer*

*v. Mitchell*, 908 F.2d 763, 766 (11th Cir. 1990). Therefore, a court may initiate civil contempt proceedings *sua sponte* if it satisfies due process. *See First Maryland*, 764 F.2d at 758–59; *see also Hall v. Stone*, 170 F.3d 706, 707 (7th Cir. 1999) (issuing an order for contempt of court *sua sponte* but providing the Warden with an opportunity to cure). Additionally, Rule 53(c)(2) authorizes an appointed master to "recommend a contempt sanction against a party and sanctions against a nonparty."

As contemplated by Rule 53, "[a]t most, due process requires only 'skeletal' protections in civil contempt proceedings: a show-cause order providing notice and a hearing in which the alleged contemnor, who may be represented by counsel, can introduce evidence rebutting the allegation of contempt and testify on its own behalf." *In re McLean*, 794 F.3d 1313, 1324 (11th Cir. 2015). "[T]he requirements of due process in civil contempt proceeding are flexible, varying with the circumstances of each case." *Mercer*, 908 F.2d at 769 n.11. "For example, . . . when there are no disputed factual matters that require an evidentiary hearing, the court might properly dispense with the hearing prior to finding [a party] in contempt and sanctioning him." *Id.*

### 2.    Criminal Contempt

In contrast to civil contempt, a finding of criminal contempt requires "both a contemptuous act and a willful, contumacious, or reckless state of mind." *In re Joyce*, 506 F.2d 373, 378 (5th Cir. 1975). "[C]riminal contempt is a crime in the

ordinary sense," and so due process requires more stringent protections in criminal contempt proceedings.  In addition to the protections a court must afford in any contempt proceeding, an alleged contemnor must also be "presumed innocent, proved guilty beyond a reasonable doubt, . . . [and] afforded a jury trial for serious contempts." *McLean*, 794 F.3d at 1324.

### D.    Other Available Sanctions

A federal district court may also sanction a party under its inherent authority. "A court's inherent power is governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017). Accordingly, "[c]ourts have the inherent power to police those appearing before them." *Id.* Specifically, "[a] court has the inherent power to award attorney's fees to a party whose litigation efforts directly benefit others, to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 1224.

## V.    DISCUSSION, APPLICATION, AND CONCLUSIONS OF LAW

### A.    The Circumstances Surrounding the Release of Frederick Mervin Bardell

The Special Master's investigation revealed that BOP's failure to follow the Court's Release Order is a symptom of much larger institutional problem.

The Release Order issued by this Court chronicled the extent of Mr. Bardell's diagnosis, granted compassionate release, and conditioned BOP's release of Mr. Bardell on approval of a release plan by Probation. (Doc. 111.) Once verified by the DSCC, the Release Order was emailed to no less than 12 individuals. (*See* Ex. T, Initial Email Transmitting Verified Release Order.) BOP initially identified seven employees responsible for some element of the relevant release procedures on the day of Mr. Bardell's release. (Doc. 99, pp. 8–12.) In addition, mailboxes for HSD and executive staff at FCI Seagoville were listed as recipients on Mr. Burnham's initial email circulating the verified Release Order. (Ex. T, Initial Email Transmitting Verified Release Order.)

Not one of the foregoing individuals, or those responsible for monitoring the receiving mailboxes, appears to have heeded the Court's directive requiring approval of a release plan from Probation prior to release. Many did not read the Order, and others failed to pay attention to the Approval Condition.

BOP blames the failure on a knee-jerk reaction to the Release Order and a desire to effect release as soon as possible. Many of the witnesses who gave statements and testimony to the Special Master spoke about the sense of urgency and sometimes panic that results upon receipt of an "immediate release" order. (Ex. U, Ruiz. Dep. 22:1–9; Ex. H, Mays Dep. 13:2–16.) Other justifications included references to BOP's policy that inmates subject to an "immediate release" order must

37

be released by 11:59 p.m. the same day. (*E.g.*, Ex. U, Ruiz Dep. 22:1–9; *see also* Ex. V, BOP Adjusted Release Notification Procedures, p. 2 (providing that "[a]ny orders specifically indicating 'Immediate Release' must be processed on the same day as received, regardless of the time of day received").) But the only place that any variation of the terms "release" and "immediate" appear in any directive in the Release Order is in the directive containing the Approval Condition, which was not followed. (Doc. 92, p. 6.)

In any event, the pace of the implemented release appears to have caused BOP employees to fail to otherwise meaningfully consider whether the transportation selected for Mr. Bardell was appropriate. While Ms. Evans (unit manager) recommended that Mr. Bardell be transported by airplane, rather than bus, due to his health condition, it strains credibility that in effecting a compassionate release— which, by definition, often signals that an inmate has a serious medical condition— BOP would implement a transportation method that required dropping Mr. Bardell off at the curb of a large airport without assistance. Equally troubling is that no one at FCI Seagoville raised any red flags about Mr. Bardell's ability to navigate a layover and change planes by himself in Atlanta.

The fact of the matter is that, in effecting release, BOP assumes responsibility for transporting the inmate to their release location and paying for the cost of that transportation. (Ex. W, Program Statement concerning Release, Gratuities,

38

Transportation, and Clothing, p. 2; Ex. R, Zook Tr. 68:21–69:6, 72:15–16; Ex. L, Kennedy Tr. 61:10–15, 62:1–8; Ex. U, Ruiz Tr. 28:21–24; Ex. K, Evans Tr. 31:23–32:2; Ex. N, King Tr. 41:23–42:1.) Given Mr. Bardell's age at the time of his release (54), his parents had no legal responsibility to pay for his flight. *Dickman v. Comm'r of Internal Revenue*, 465 U.S. 330, 341 (1984) ("Our laws require parents to provide for their minor offspring with the necessities and conveniences of life . . . . Generally, the legal obligation of support terminates when the offspring reach majority."). As explained below, these factors support the imposition of a compensatory contempt sanction, payable to the Bardells, for the cost of the plane ticket.

In assuming responsibility for arranging release transportation, BOP employees generally consider safety to the public, cost to the agency, and the reasonableness of the inmate's time in transit. (*E.g.*, Ex. H, Mays Dep. 9:6–10:3, 30:8–19; Ex. L Kennedy Dep. 62:23–63:1, 64:5–18; Ex. N, King Dep. 30:2–13.) When asked whether an inmate's medical condition is a consideration in arranging transportation, FCI employees at Seagoville largely avoided the question. (Ex. H, Mays Dep. 10:4–7; Ex. L, Kennedy Dep. 63:2–7; *but see* Ex. N, King Dep. 30:16–18 (testifying that it is not a consideration).)

Importantly, BOP has a procedure for considering the medical condition of an inmate during transportation. It appears that this procedure, however, is only uniformly implemented at medical referral centers—that is, Federal Medical

Centers, or FMCs. During the investigation, Dr. TeCora Ballom, regional medical director for BOP' South-Central region—which has oversight of 16 BOP facilities spanning Louisiana, Oklahoma, New Mexico, Arkansas, and Texas—spoke to the Special Master at length about the transportation considerations in place for inmates releasing from an FMC. Specifically, once a release order is received, the unit team, social worker, clinical director, staff physician, and associate warden meet to discuss the best mode of transportation. If an inmate is receiving inpatient treatment, would have difficulty maneuvering a flight by himself, or may need close monitoring by a nurse during transport, an air ambulance is considered. According to Dr. Ballom, BOP pays for this medical transport. Compassionate release orders at FMC Carswell, where Dr. Ballom is stationed, are also read several times, receive interpretation by an attorney, and are consulted on by a medical team to make sure the inmate is stable.

When asked why such procedures were not implemented at institutions such as FCI Seagoville, Dr. Ballom shared that non-medical institutions are not accustomed to having sicker inmates and, accordingly, non-medical staff at non-medical institutions likely would not have had the relevant experience to know that air ambulance transport could be considered. It is clear that BOP did not provide training on alternative transportation arrangements for releasing inmates with serious medical conditions at FCI Seagoville.

Overall, neither BOP policy nor institution procedure created sufficient mechanisms to ensure that the relevant staff read the Court's Release Order, took note of any special conditions, or complied with the same. Nor did any applicable policy, procedure, or practice ensure that an appropriate release plan was actually approved by Probation prior to Mr. Bardell's release, despite an analogous policy requirement and institution practice with respect to obtaining Probation's approval of Supervision Release Plan forms. And despite the Court's inclusion of the Approval Condition in its Release Order, FCI Seagoville employees never attempted to communicate with Probation, or Ms. Copeland, on the day of Mr. Bardell's release. Instead, they only spoke to Mr. Bardell's mother and instructed her to purchase a plane ticket for his release. And despite being uniquely positioned to observe Mr. Bardell's physical condition, they did not meaningfully consider whether his medical condition warranted alternate transportation. As a result, Mr. Bardell arrived at the Jacksonville airport weak, bloodied, and soiled, where he was met by his parents who were horrified by his deterioration.

Based on the foregoing, the Special Master concludes that BOP and Warden Zook should be held in civil contempt for violating the Release Order and sanctioned: (1) $494.20 in compensatory damages for the cost of Mr. Bardell's flight on February 8, 2021, which was coordinated in contravention of the Approval Condition; as well as (2) the Special Master's compensation in prosecuting this

41

contempt proceeding. In the absence of the requisite causation, the Special Master concludes that no further remedy may be appropriate in the instant proceedings.

## B.    The Nature of the Instant Contempt Proceedings

Based on its investigation, the Special Master concludes that the instant proceedings are properly classified as civil contempt proceedings.

### 1.    Inapplicable Grounds for Sanctions

The evidence does not support a finding of criminal contempt or sanctions under the Court's inherent power. First, the Special Master finds that there is insufficient evidence of criminal willfulness to justify a finding of criminal contempt. To convict a party of criminal contempt, it must be established that the court entered a lawful order of reasonable specificity that the party willfully violated. *United States v. Straub*, 508 F.3d 1003, 1010 (11th Cir. 2007). In the context of criminal contempt proceedings, to constitute willfulness, a party must intentionally violate the court's order or must exhibit conduct which constitutes reckless disregard for the orders of the court. *United States v. KS & W Offshore Eng'g, Inc.*, 932 F.2d 906, 909 (11th Cir. 1991). Negligent, accidental, or inadvertent violation of an order is insufficient. *Id.* Moreover, the evidence supporting an order of criminal contempt must permit a finding of guilt beyond a reasonable doubt. *Straub*, 508 F.3d at 1008. While, as discussed below, the circumstances of Mr. Bardell's release

support a finding a reckless disregard for the Court's Release Order, the evidence does not establish this beyond a reasonable doubt.

Second, the record is devoid of any evidence of bad faith to warrant invocation of the Court's inherent power. "The key to unlocking a court's inherent power is a finding of bad faith." *Purchasing Power,* 851 F.3d at 1223. A party can demonstrate bad faith by delaying or disrupting litigation or hampering enforcement of a court order. *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). However, "recklessness alone does not constitute conduct tantamount to bad faith." *Id.* In light of this standard, while the failings were both troubling and reckless, the Special Master finds that the conduct of the FCI Seagoville employees in failing to comply with the Approval Condition in the Release Order did not rise to the level of bad faith.

The Eleventh Circuit has also cautioned that "inherent powers should be used sparingly, particularly when an alternate basis for sanctions is available." *McLean*, 794 F.3d at 1319. Accordingly, in the absence of any evidence of bad faith, and because an alternative basis for sanctions is available, *see infra*, the Special Master concludes that sanctions cannot be imposed under the Court's inherent power, as Ms. Copeland suggests. (*See* Doc. 107, pp. 6–9.)

## 2.   Civil contempt

A charge of civil contempt is the most appropriate sanction mechanism in the instant proceedings. "[C]ivil contempt is remedial," *Straub*, 508 F.3d at 1009, and it "occurs when a party disobeys a specific and definite court order by failing to take all reasonable steps within that party's power to comply with the order," *Hugler*, 2017 WL 8186737, at *9. Such is the case here.

The Court's Orders dated February 16, 2021, and April 13, 2021, address BOP's failure to fully comply with the directives of its Release Order, which the government conceded in its responses. Based on the record, the Court may properly determine whether BOP and Warden Zook employed all reasonable means to comply with the Release Order. Accordingly, the Special Master finds that the relevant issues before the Court are whether a finding of civil contempt and civil sanctions are warranted under the circumstances.

## C.   Applicable Scienter

This report contains references to distinct forms of scienter throughout. Under controlling jurisprudence, willfulness is required for a finding of criminal contempt. *KS & W Offshore Eng'g*, 932 F.2d at 909 ("The essential elements of criminal contempt are a lawful and reasonably specific order of the court and the willful violation of that order.") In the criminal context, willfulness is defined as "a deliberate or intended violation, as distinguished from an accidental, inadvertent, or

negligent violation of an order." *Straub*, 508 F.3d at 1012. Reckless disregard for court orders is also sufficient to prove criminal contempt, but only if proven beyond a reasonable doubt. *See KS & W Offshore Eng'g*, 932 F.2d at 909.

One key distinction between the proof required to support a *finding* of criminal verses civil contempt is the requirement of scienter. Willfulness is *not* required for a finding of *civil* contempt because subjective intent is irrelevant. *See F.T.C. v. Leshin*, 618 F.3d 1221, 1232; *Claudio*, 499 F. App'x at 867.

However, the government has taken the position that, once a party has met the elements of civil contempt, willfulness then becomes a factor that courts must consider in determining whether to exercise their discretion to impose *sanctions*. (Doc. 106, pp. 6, 14–15.) While the Special Master disagrees that willfulness is a factor in considering civil *compensatory* sanctions, the undersigned has nevertheless endeavored to make the following alternative finding: *if* willfulness must be considered by federal district courts in determining whether to impose compensatory sanctions for civil contempt, then the evidence of recklessness suffices here. This is because, in the civil context, willfulness also includes recklessness. *United States v. Rum*, 995 F.3d 882, 888 (11th Cir.), *cert. denied*, 142 S. Ct. 591 (2021). As defined by the Eleventh Circuit, recklessness means a gross deviation from the standard of care. *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1240 (11th Cir. 2007).

45

So, to summarize, in contempt proceedings, scienter is required for a *finding* of criminal contempt, while—at least in the government's view—scienter may weigh in favor or against the imposition of civil contempt *sanctions*. The Special Master finds that the instant contempt proceedings should move forward on a civil contempt charge and has also applied the "recklessness" standard in assessing whether sanctions are warranted here. However, because controlling case law discussing contempt often uses the term "willfulness" pervasively, that term appears throughout this report. The Special Master will only use the term "willfulness" when quoting such case law or another party's argument. His independent analysis will employ the term "recklessness."

### D.    The Parties to the Instant Contempt Proceedings

Before turning to the civil contempt charge, the Special Master finds it necessary to address the identity of the proper parties to this action. Ms. Copeland and the government presented arguments on this issue in connection with Ms. Copeland's motion to substitute Craig and Charlotte Bardell for their son, pursuant to Rule 25(a)(1) of the Federal Rules of Civil Procedure. (*See* Docs. 113, 126.) While U.S. Magistrate Judge Kidd denied the motion, he did so based on his finding that "the instant action is a criminal proceeding not a civil contempt action." (Doc. 127.) Given the Special Master's recommendation, explained above, that the instant proceedings should move forward on a civil contempt charge, the Special

Master respectfully offers additional findings and analysis to clarify the proper parties to this proceeding at this juncture.

By all accounts, the instant proceedings sound in civil contempt and are no longer proceeding as a criminal action. The Court's April 13, 2021 Show Cause Order specifically references civil contempt. (Doc. 99, pp. 1, 6, 7.) In addition, the government is defending, not prosecuting this action. To be sure, the United States' attorney liaison is not a criminal prosecutor but works in the civil division of the Orlando United States Attorney's Office. The Court's Appointment Order was also entered pursuant to Rule 53 of the Federal Rules of *Civil* Procedure. (Doc. 111.)

Relatedly, despite Ms. Copeland's equivocal footnote in her motion to substitute the parties (*see* Doc. 113, p.3, n.2),[12] the Special Master disagrees that Mr. Bardell was never a party to these proceedings. These proceedings stemmed from BOP's violation of the Release Order granting Mr. Bardell's motion for compassionate release. It was Ms. Copeland, acting in her capacity as Mr. Bardell's attorney, who drafted the February 12, 2021 status report[13] notifying the Court of

---

[12] This footnote stated that "[t]he Bardells underst[ood] that their son was not *technically* a party to the possible civil contempt action since [it] was initiated *sua sponte* by the court." (emphasis added).

[13] Though styled as a joint motion, AUSA Chang told the Special Master that she only consented to the filing via email and did not draft it or discuss it with Ms. Copeland further. This is corroborated by emails produced both by Ms. Copeland and the United States. (*See* Ex. A, Copeland-Chang Email concerning February 12, 2021 Joint Status Report.)

the violation and prompting the Court to issue its initial Order. (*See* Docs. 94, 96.). And in its subsequent Show Cause Order, the Court expressly permitted Ms. Copeland to present briefing on the issue of contempt. (Doc. 99, p. 2.) Moreover, civil contempt proceedings—as opposed to their criminal counterparts—are necessarily adversarial. *See Straub*, 508 F.3d at 1009 ("Whereas proceedings for civil contempt are between the original parties[] and are instituted and tried as part of the main cause, proceedings for criminal contempt are between the public and the defendant[] and are not part of the original cause."). As such, the proceedings would not ordinarily have been limited to the Court, the Special Master, BOP, and Warden Zook, as the government suggests.  (*See* Doc. 126, p. 2.)

However, Rule 25(a)(1) provides no relief for avoiding the time limitation allowed for a motion for substitution of parties. Rather, it provides that, "[i]f the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent *must* be dismissed." Fed. R. Civ. P. 25(a)(1) (emphasis added). On February 18, 2021, Ms. Copeland and the United States filed a joint status report notifying the Court that Mr. Bardell had "succumbed to his illness" and died on February 17, 2021. (Doc. 97, p. 1.) By electronically filing the status report with the Court using the CM/ECF system, an email notification linking the filing was automatically sent to all attorneys of record, constituting "service of a

statement noting the death." *See* Fed. R. Civ. P. 5(b)(1)(E) (providing that service is made "by filing it with the court's electronic-filing system"). To preserve the right to survivorship of the contempt action as to Mr. Bardell, the motion to substitute the parties had to be filed within 90 days of the February 18, 2021 joint status report— i.e., by May 19, 2021. *See* Fed. R. Civ. P. 25(a)(1). Because the Court had clearly signaled its intent to consider a civil contempt charge or other sanctioning mechanism by that time and had directed the parties to brief the issue (*see* Doc. 99, p. 7), former counsel for Mr. Bardell was on notice of the nature of the proceedings before the expiration of the Rule 25(a)(1) deadline. However, she did not file her motion to substitute a party until January 31, 2022. (Doc. 113.) At that point, Rule 25(a)(1) operated to preclude the motion without exception.

In the absence of Rule 25(a)'s time limitation, Ms. Copeland's substitution motion may have been well taken, as "[i]t is well-settled that remedial actions survive the death of the plaintiff." *United States v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993), *as amended*, (Jan. 12, 1994). Of course, as a civil contempt proceeding, any sanction awarded here must be remedial. *Kennedy v. Alabama State Bd. of Educ.*, 78 F. Supp. 2d 1246, 1257 M.D. Ala. 2000). ("A civil contempt sanction, regardless of form, is remedial in nature.").

Nevertheless, Rule 25(a)(2) provides for continuation of an action among the remaining parties following a party's death "if the right sought to be enforced

survives only to or against the remaining parties." Fed. R. Civ. P. 25(a)(2). The instant civil contempt proceeding, having been initiated by the Court on its own motion, with notice and opportunity to be heard provided to the parties, and being prosecuted by independent counsel, thus survives. Moreover, the Court is not without power to award compensatory damages to a nonparty to these proceedings if the evidence so warrants. *See Leshin*, 618 F.3d at 1239 (affirming the district's court order of civil contempt and civil sanctions disgorging all fees collected in violation of injunction where the sanctions were imposed to compensate nonparty consumers for the losses they sustained).

Accordingly, the Special Master recommends that the Court affirm that the parties to the instant civil contempt proceedings constitute the Special Master, BOP, and Warden Zook.

With respect to Warden Zook, the Special Master finds it necessary to clarify the capacity in which the civil contempt charge is proceeding against her. Select provisions of the Federal Torts Claims Act ("FTCA") are instructive here. The FTCA provides that federal district courts:

> have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.

28 U.S.C. § 1346(b)(1). Under this statute, "[a]n employee of the government includes . . . officers or employees of any federal agency . . . and persons acting on behalf of a federal agency in an official capacity." 28 U.S.C. § 2671.

Additionally,

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States . . . .

28 U.S.C. § 2679(d)(1).

Warden Zook's involvement in these proceedings stems from her position as "chief executive offer" at FCI Seagoville on the date of Mr. Bardell's release. (*See* Position Description for Warden, Ex. X, p. 1.) Warden Zook confirms her responsibilities in her declaration supporting the government's response to the Court's April 13, 2021 Show Cause Order. (Doc. 106-2, ¶ 2.) As relevant here, these responsibilities include: "the guidance and direction of approximately 280 staff "; "plan[ning] and review[ing] the work of staff, evaluat[ing] staff work performance, and identify[ing] training needs"; and responsibility for "the administrative and organizational controls of the institution." (*Id.*) The position description provided by BOP for the Warden also includes the following duties and responsibilities:

- Supervisory work and related managerial responsibilities, occupying at least 25 percent of the position's time (Ex. X, Position Description for Warden, p. 3);
- Accomplishment of work through the combined technical and administrative direction of subordinate employees (*id.*);
- Full authority and responsibility to carry out directives of the federal courts (*id.* at 5); and
- Appearances in court on behalf of the government in events such as violations occurring within the institution (*id.* at 7).

The instant civil contempt charge alleges failure to ensure compliance with an order of a federal court—a responsibility plainly within Warden Zook's job responsibilities (*see id.* at 5). She is also responsible for making court appearances on behalf of the government where a violation occurs within an institution under her purview. (*Id.* at 7.) Based on analogous guidance within the FTCA, the Special Master recommends that the instant contempt charge proceed against Warden Zook in her official capacity and, therefore, be deemed an action against the United States. *See* 28 U.S.C. § 1346(b)(1) *and* 28 U.S.C. § 2679(d)(1); *see also Mobile Cnty. Jail Inmates v. Purvis*, 551 F.Supp. 92, 93, 97 (S.D. Ala. Nov. 15, 1982), *aff'd mem.*, 703 F.2d 580 (11th Cir. 1983) (holding county officials and the sheriff in civil contempt, based on their authority, financial resources, and supervisory and operation obligations to comply with the court's injunction concerning overcrowding at county jail, where plaintiffs moved to hold the officials and the sheriff in contempt in their official capacities).

This recommendation does not, however, preclude the Court from continuing to name Warden Zook as a party to this action. *See* Fed. R. Civ. P. 17(d) ("A public officer who sues or is sued in an official capacity may be designated by official title rather than by name, but the court may order that the officer's name be added.)

### E. Whether BOP and/or Warden Zook Should Be Held in Contempt for Violating the Release Order

The Special Master recommends that both BOP and Warden Zook be held in contempt for violating the Release Order. "A finding of civil contempt must be supported by clear and convincing evidence that the allegedly violated order was valid and lawful, the order was clear and unambiguous, and the alleged violator had the ability to comply with the order." *Leshin*, 618 F.3d at 1232. The government has previously conceded that each of the foregoing elements are met here. (Doc. 106, p. 7.)

An alleged contemnor, however, is entitled to a hearing to present any defenses that it may have had to the alleged contumacious conduct. *First Maryland*, 764 F.2d at 759. Though the parties will be provided an opportunity to present written responses to the Special Master's contempt finding and appear at a hearing on the matter, their responses to the Court's April 13, 2021 Show Cause Order are instructive. Notably, the government's response contains no defenses to the elements of a contempt finding, only to the imposition of sanctions. (Doc. 106, pp. 7, 14–15.)

53

Nevertheless, the Court's Appointment Order directed the Special Master to investigate whether BOP reasonably attempted to comply with the Release Order. The Special Master finds that BOP did not.

Whether BOP reasonably attempted to comply with the Release Order is relevant to the third element of a civil contempt finding—that the alleged violator had the ability to comply with the order. "Parties subject to a court's order demonstrate an inability to comply only by showing that they have made in good faith all reasonable efforts to comply." *PlayNation Play Sys., Inc. v. Velex Corp.*, 939 F.3d 1205, 1213 (11th Cir. 2019). The Eleventh Circuit construes this requirement strictly. *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 984 (11th Cir. 1986). Even where a party makes substantial, diligent, or good faith efforts, if it does not make all reasonable efforts to comply, it cannot rebut a prima facie showing of contempt. *Id.* "[T]he mere fact that a party may have taken steps toward achieving compliance is not a defense to a contempt charge." *Sizzler Family Steak Houses v. W. Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1534 n.5 (11th Cir. 1986).

Based on his investigation, the Special Master finds that BOP only attempted to comply with *part* of the Release Order. Specifically, once FCI Seagoville employees received the Release Order, they made efforts toward completing the release paperwork, making transportation arrangements, and effecting the physical

release of Mr. Bardell from the prison. However, *no* efforts were made to comply with the Approval Condition, let alone reasonable ones.

The Approval Condition of the Release Order conditioned BOP's release of Mr. Bardell on the approval of a plan of release created by Mr. Bardell's counsel and Probation. (Doc. 92, p. 6.) The Special Master acknowledges that this was a special condition that FCI Seagoville employees may not have previously encountered. However, the evidence largely demonstrates that they did not comply with it because they did not read it.

Of note, AUSA Chang's email transmitting the Release Order to BOP stated that "Judge Dalton ordered BOP to release [Mr.] Bardell in accordance with the attached order" and specifically noted that Mr. Bardell's "counsel ha[d] been ordered to work with Probation to fashion an acceptable plan of release." (Doc. 106-3, pp. 7–10.) Ms. Kennedy, Ms. Evans, Mr. King, Ms. Mays, Ms. Ruiz, and Mr. Burnham all received the Release Order with Ms. Chang's notations at the bottom of the email chain. (*Id.*; *see also* Ex. I, Burnham Dep. 25:21–26:3.) Despite this, FCI Seagoville employees responsible for effecting Mr. Bardell's release did not read the Release Order at all, did not read it carefully, did not take note of the Approval Condition, or simply assumed that Probation had already approved a release plan. (Ex. H, Mays Dep. 16:23–17:15; Ex. L, Kennedy Dep. 41:6–42:10; Ex. U, Ruiz Dep. 23:16–18; Ex. K, Evans Dep. 19:25–26; Ex. I, Burnham Dep. 27:3–28:14; Ex. N, King

Dep. 20:24–21:4.) Even Ms. Evans, who testified that she had primary responsibility for ensuring that the conditions of a release order are complied with, did not read it. (Ex. K, Evans Dep. 24:11–25:23.)

It is worth noting that when asked to read the Release Order during their depositions, many of the FCI Seagoville employees believed that the release plan referenced in the Release Order was synonymous with BOP's Supervision Release Plan form. Had Mr. King at least read the Release Order and contacted Probation for approval of BOP's Supervision Release Plan form, as was his general practice, perhaps it could have been said that he attempted to comply with the Approval Condition based on his understanding of what a release plan was. Had he contacted Probation, he likely would have been informed that, pursuant to the Release Order, Mr. Bardell's counsel and Probation would be submitting an approved release plan and that, under such plan, Mr. Bardell would be released to a hospital in Jacksonville. However, Mr. King testified that he forgot to submit the Supervision Release Plan to Probation for approval. (Ex. N, King Dep. 25:13–17, 20:12–16.) Instead, he and Ms. Evans drafted and signed the Supervision Release Plan form containing a release address that Probation would not have approved. (*See* Ex. Q, Mr. Bardell's Supervision Release Plan.) Indeed, Probation had received notice from local law enforcement that Mr. Bardell could not be released to the address on the Supervised Release Plan form due to its proximity to a nearby school and daycare. The problem

was further compounded by the fact that, when Mr. Burnham signed Mr. Bardell's Release Authorization form, he simply assumed that the Supervision Release Plan had been approved by Probation without verifying it. (Ex. I, Burnham Dep. 27:3–28:14.)

The fact that no one at FCI Seagoville attempted to contact Probation, or even Ms. Copeland, about the release plan is itself evidence of a failure to attempt compliance with the Approval Condition. An equally compelling piece of evidence on this point is testimony from ACMC Ruiz who expressed confusion concerning the operation of the Approval Condition when she was asked to read it during her deposition, despite not remembering whether she read the Release Order on the day of Mr. Bardell's release. (Ex. U, Ruiz Dep. 35:12–36:2, 41:5–13.) She ultimately testified that, if she read it now, she would have asked Ms. Kennedy, the Warden Secretary, or regional counsel about the Approval Condition. (Ex. U, Ruiz Dep. 43:5–19.) Such an inquiry may have constituted a reasonable attempt to comply with the Release Order. But no inquiry was made. The Approval Condition was either not read or simply ignored.

The actions of the FCI Seagoville employees clearly demonstrate that BOP did not comply, or even reasonably attempt to comply, with the Release Order. Almost all BOP staff charged with executing the Release Order admitted to not reading it in its entirety or at all. The only employee who did read it assumed, without

verifying, that the Approval Condition had been satisfied. (Ex. I, Burnham Dep. 27:3–28:14.) While the Court has discretion in determining whether to hold a party in contempt, *Mercer*, 908 F.2d at 770, the Special Master finds that the failure of BOP employees to take any action towards compliance with the Approval Condition counsels in favor of holding BOP and Warden Zook in civil contempt. Indeed, Ms. Ruiz testified that, prior to this incident, release practices at FCI Seagoville did not include reading release orders. (*See* Ex. U, Ruiz Dep. 43:5–19.) The impropriety of such practices cannot be ignored. Accordingly, the Special Master recommends that the Court exercise its discretion to hold BOP and Warden Zook in civil contempt for violation of the Court's Release Order.

### F.    Whether Sanctions are Warranted and Against Whom

The Special Master also concludes that compensatory sanctions are warranted against BOP.  Such sanctions are limited to: (1) $494.20 for Mr. Bardell's plane ticket to Jacksonville on the day of his release, payable to Craig and Charlotte Bardell; and (2) the Special Master's attorney fees, which have already been ordered by the Court. The Special Master's recommendation concerning the imposition of sanctions on BOP alone is premised on his conclusion that Warden Zook should be held in contempt in her official capacity. In such a scenario, any imposed sanction would issue against the United States. *Cf.* 28 U.S.C. § 2679(d)(1). Should the Court, however, find Warden Zook in contempt in her individual capacity and, therefore,

individually responsible for sanctions, the Special Master recommends that she only be sanctioned in the amount of $494.20, as a compensatory sanction payable to the Bardells for the cost of their son's plane ticket on the day of his release, with BOP to bear the remaining sanction.

Ordinarily, "[c]ivil contempt sanctions may be imposed for either or both of two distinct purposes, to coerce compliance with a court order, and to compensate the complainant for actual losses sustained by him as the result of the defendants' contumacy." *In re Chase & Sanborn Corp.*, 872 F.2d 397, 400–01 (11th Cir. 1989). As an initial matter, coercive sanctions are inapplicable here. BOP's action in prematurely releasing Mr. Bardell without the requisite approval of a release plan by Probation cannot be undone. The Court cannot retroactively coerce BOP to comply with its Release Order, and so the government's civil contempt cannot be purged. *Cf. Marshall v. Whittaker Corp., Berwich Forge & Fabricating Co.*, 610 F.2d 1141, 1145 (3d Cir. 1979) ("[T]o purge a civil contempt citation is to comply with all aspects of the underlying order."). Accordingly, the Special Master turns to the availability of compensatory sanctions.

District courts have broad discretion to impose non-coercive sanctions in civil contempt proceedings, so long as they are compensatory. *Leshin*, 618 F.3d at 1239. Cognizant of this, in its response to the Court's April 13, 2021 Show Cause Order, the government offers evidence of proactive remedial measures put in place by

59

Warden Zook following Mr. Bardell's release purportedly to prevent FCI Seagoville from failing to comply with any future release orders. (Doc. 106, p. 15; *see also* Ex. AB, New FCI Seagoville Routing Slip for Immediate Releases.) While the Special Master takes some comfort in the fact that judicial release orders are now required reading for FCI Seagoville employees processing releases (*see, e.g.*, Ex. U, Ruiz Dep. 43:5–19), this does not counsel against the imposition of sanctions. Failure of a federal institution to read and follow a judicial order is inexcusable, particularly under these circumstances.

In addition, the remedial measures put in place at FCI Seagoville by Warden Zook ring hollow for a separate reason. During her deposition, Warden Zook, who is now the warden of a different prison, testified that she has not put the same remedial measures in place at her new facility. (Ex. R, Zook Dep. 60:13–15.) When asked why she had not, Warden Zook failed to give any answers to assuage the Special Master's concerns that the remedial measures she put in place at FCI Seagoville were only done to placate the Court following her receipt of the February 16, 2021 Order. (*Id.* at 61:10–62:22.) The Special Master finds that such testimony renders Warden Zook's subsequent remedial measures at FCI Seagoville insincere. Accordingly, they do not weigh against the imposition of sanctions.

The remaining defense to the imposition of compensatory sanctions set forth in the government's response to the Court's April 13, 2021 Show Cause Order is its

request that the Court consider evidence indicating a lack of willfulness in violating the Release Order.  (Doc. 106, p. 15.) In support, the government cites two district court opinions from the Northern District of Georgia and Middle District of Florida for the proposition that, in imposing a civil contempt sanction, the U.S. Supreme Court requires courts to assess the following four factors: "(1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order." (Doc. 106, p. 6 (citing *Hugler*, 2017 WL 8186737, at *15 and *State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, 2013 WL 12214330, at *2 (M.D. Fla. July 8, 2013).) BOP only challenges the Court's discretion to impose compensatory damages on the ground that its employees did not willfully disregard the Release Order. (Doc. 106, pp. 7, 14–15.)

However, a closer examination of the Supreme Court case relied on in these district court orders reveals that these factors are not mandatorily applied in determining the propriety of *compensatory* sanctions in civil contempt proceedings. Rather, these factors apply to the imposition of *criminal contempt sanctions* and *coercive sanctions* in civil contempt proceedings.  *See United States v. United Mine Workers*, 330 U.S. 258, 303–94 (1947). "In the *civil* contempt context, the discretion the district court has to impose *noncoercive sanctions* is particularly broad and *only*

61

limited by the requirement that they be compensatory." *Leshin*, 618 F.3d at 1239 (emphasis added). Therefore, the Special Master concludes that compensatory sanctions are permissible here based solely on a finding of contempt and provable damages. *See In re Chase & Sanborn Corp.*, 872 F.2d 397, 401 (11th Cir. 1989 ("If the fine is compensatory, it is payable to the complainant and must be based on proof of the complainant's actual loss.").

Alternatively, the Special Master finds that the character of FCI Seagoville employees' conduct weighs in favor of imposing compensatory sanctions. "In civil cases, willfulness has traditionally been interpreted to include recklessness." *Rum*, 995 F.3d at 888; *see also United States v. Green*, 457 F.Supp.3d 1262, 1272 (S.D. Fla. 2020) (applying recklessness standard in civil action to recover unpaid financial penalties for the willful failure to timely file an accurate Foreign Bank Account Report where the government took the position that recklessness is sufficient to demonstrate willfulness). "[R]eckless conduct simply means conduct that grossly deviates from reasonable conduct." *Amlong*, 500 F.3d at 1240. Here, the evidence demonstrates that BOP employees acted recklessly in failing to read and follow the Court's Release Order.

Failure to read a court order inexcusable. *See, e.g.*, *Robinson v. Aerotek, Inc.*, No. 8:11-CV-00148-EAK, 2011 WL 2222186, at *2 (M.D. Fla. June 7, 2011) ("[N]owhere in [Rule 60(b)] does it state that the one of the reasons for which a court

may relieve a party from final judgment is inexcusable neglect or willful failure to read a court order."); *cf. Dynasty Mgmt. Grp., LLC v. Alsina*, No. 16-20511-CIV, 2016 WL 9376356, at *1 (S.D. Fla. Nov. 1, 2016) (stating that "counsel's resulting failure to read the Court's orders and familiarize himself with case documents is inexcusable"). By definition, inexcusable neglect denotes more than ordinary negligence. *Neglect*, Black's Law Dictionary (11th ed. 2019) (defining inexcusable neglect as "unjustifiable neglect" and "neglect that implies more than unintentional inadvertence").

Though neither BOP, nor the Warden, can be charged with the professional responsibility of an attorney, they are nevertheless routinely subject to orders of a sentencing court. On the day of Mr. Bardell's release, however, they chose to follow their routine procedures rather than the specific directives of the Release Order. This was done at every level of the reporting chain from the unit secretary up to the Warden. Whether this was a result of the individual employees' failure to read the Release Order or to take heed of the Court's directives, the failing constitutes reckless disregard for a court order because it "grossly deviates from reasonable conduct." *Amlong*, 500 F.3d at 1240. This weighs in favor of the imposition of sanctions against BOP and Warden Zook. *Cf. Hall*, 170 F.3d at 708 ("Ignoring a judicial order, as Warden Fanello did, because a prisoner contradicts it, is out of the question.").

63

The government's response to the Court's April 13, 2021 Show Cause Order nevertheless appears to suggest that coordination with Mr. Bardell's parents concerning his method of release transportation demonstrated a lack of "willfulness" on the part of the FCI Seagoville employees involved in effecting Mr. Bardell's release. (*See* Doc. 106, pp. 11, 13.) But such arrangements do not demonstrate that the employees' failure to heed the Approval Condition in the Release Order was not reckless. "Each party to a court order is responsible for ensuring its own compliance with that order . . . ." *Sizzler*, 793 F.2d at 1535. BOP did not fulfill that responsibility. As such, BOP's phone call with Mr. Bardell's parents—who had no obligations under the Release Order—does not negate the recklessness of BOP's failure to follow the Release Order.

Nor does Ms. Copeland's phone call with Mr. Bardell on the day of his release, in which she acquiesced to Mr. Bardell's suggestion that BOP was making his transportation arrangements and assuming financial responsibility for the same, have any bearing on the nature of BOP's disregard for what the Release Order required of it. That Ms. Copeland—who represented his legal interests and not his physical custody—urged Mr. Bardell to leave the facility that day in whatever way possible does not change the calculus. The Release Order only directed Ms. Copeland to coordinate with Probation on an appropriate release plan. On the day of Mr. Bardell's release, she was actively complying with that directive, as was

64

Probation. BOP, however, did not wait to receive an approved release plan from Probation before releasing Mr. Bardell, as the Release Order required.

To be sure, BOP and Warden Zook—who had full authority and responsibility to carry out the Court's Order (*see* Ex. X, Position Description for Warden, p. 5)— were the only parties that did not comply with the Release Order. Their actions in failing to do so were reckless. Accordingly, the Special Master concludes that compensatory sanctions are warranted against both BOP and Warden Zook.

### G.    Recommended Sanctions

In addition to the Special Master's compensation, which the Court has already ordered, the Special Master recommends that the Court impose compensatory sanctions on BOP for the cost of Mr. Bardell's plane ticket on the day of his release.

### 1.    The Cost of Mr. Bardell's Plane Ticket

On the day of Mr. Bardell's release, FCI Seagoville employees asked Mr. Bardell's parents to pay for his transportation to Jacksonville because no contract flights were available. BOP would otherwise have been obligated to pay for the flight. Because unit secretary Mays coordinated these flight arrangements without waiting for approval of a release plan by Probation, the Special Master concludes that compensatory damages for the cost of the flight should be awarded to the Bardells.

BOP's responsibility to transport a releasing inmate to his or her release location is set forth in the Code of Federal Regulations. The applicable provision provides that "[t]ransportation will be provided to an inmate's place of conviction or to his/her legal residence within the United States or its territories." 28 C.F.R. § 571.22(c); *see also* 28 C.F.R. § 571.20 (setting forth BOP policy that a releasing inmate will have transportation to the inmate's release destination). "Based on the inmate's need and financial resources, a discretionary gratuity up to the amount permitted by statute may be granted." 28 C.F.R. § 571.20. "An inmate is eligible for a gratuity as determined by the availability of personal and community resources." 28 C.F.R. § 571.21(a).

Per BOP policy "[i]nmates are encouraged to save funds for release in his or her trust fund account." (Ex. W, Program Statement concerning Release, Gratuities, Transportation, and Clothing, p. 1.) However, the same policy provides that "[i]nmates whose offenses were committed on or after November 1, 1987, may be authorized a discretionary gratuity of up to $500, based upon the inmate's needs and financial resources." (*Id.* at 2.) "Unit staff may recommend, with the [CMC's] approval, a release gratuity of up to $250. When unit staff believe that a gratuity in excess of $250 is warranted, the Warden's approval is required." (*Id.*)

 "A release gratuity cannot provide for an inmate's entire release needs and is only intended to supplement other resources that may be available." (*Id.* at 2.)

66

Institution staff *may* consider an inmate's community resources, such as family, in deciding whether to exercise their discretion to provide a gratuity for transportation costs. (*Id.* at 4.) However, this is not a requirement. Nevertheless, "[i]f an inmate chooses to use transportation other than what [BOP] provides, the inmate or the inmate's family must pay the entire transportation cost; [BOP] will absorb no part of the cost." (*Id.* at 5.)

Consistent with the foregoing regulations and policy statements, FCI Seagoville employees unequivocally testified that BOP is responsible for transporting an inmate to his or her release destination and paying for the transportation costs. (Ex. R, Zook Tr. 68:21–69:6, 72:15–16; Ex. L, Kennedy Tr. 61:10–15; Ex. U, Ruiz Tr. 26:21–24; Ex. K, Evans Tr. 31:23–32:2; Ex. N, King Tr. 41:23–42:1.) Because of health concerns, on the day of Mr. Bardell's release, FCI Seagoville employees exercised their discretion to provide him with commercial flight transportation back to Florida. (Ex. H, Mays Dep. 10:25–11:16; Ex. K, Evans Tr. 33:2–22.) This decision was approved by the CMC. (Ex. K, Evans Tr. 36:17–37:20.) However, due to the unavailability of contract flights, unit secretary Mays asked Mr. Bardell's parents if they would be willing to pay for the flight. (Ex. L, Kennedy Tr. 71:22–72:12; Ex. H, Mays Tr. 11:23–12:11.) Mr. Bardell's parents agreed. (Ex. H, Mays Tr. 12:9–11.)

The flight was booked during a telephone call between Mr. Bardell's mother and Ms. Mays. (Ex. H, Mays. Dep. 12:3–16.) Mr. Bardell was in the room with Ms. Mays at the time. (*Id.* at 6–8.) Charlotte Bardell read the available flights to Ms. Mays over the phone, and Ms. Mays responded "yes or no." Ms. Mays eventually said yes to a flight with a layover in Atlanta.

A compensatory sanction based on a finding of civil contempt "reimburses the injured party for the losses and expenses incurred because of his adversary's noncompliance. This [reimbursement] includes losses flowing from noncompliance . . . ." *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450, 458 (11th Cir. 1984). In a civil contempt action, damages must only be proven by a preponderance of the evidence. *McGregor v. Chierico*, 206 F.3d 1378, 1387 (11th Cir. 2000). The Eleventh Circuit has also upheld an award of compensatory sanctions to a non-party in civil contempt proceedings. *See, e.g.*, *Leshin*, 618 F.3d at 1239. Here, the Special Master recommends that BOP compensate the Bardells for the cost of the commercial airline ticket.

The causation here is twofold. First, had FCI Seagoville employees complied with the Approval Condition, Charlotte Bardell would not have booked the flight at that time. Ms. Mays instructed Charlotte Bardell as to which flight to select for Mr. Bardell's release transportation, but BOP had not yet received the requisite approval of a release plan from Probation to authorize Mr. Bardell's release. Second,

68

on the day of his release, Mr. Bardell had only $17.45 in his personal account according to his Release & Gratuity Information form.[14] (Doc. 106-3, p. 46.) As such, but for the benevolence of Mr. Bardell's parents, BOP was responsible for paying for this flight. *See* 28 C.F.R. § 571.22(c); *see also* 28 C.F.R. § 571.20 *and Dickman*, 465 U.S. at 341 (stating that parents are ordinarily not financially responsible for their adult children). Ms. Mays testified that, if Mr. Bardell's parents had been unable to pay, BOP would have paid for a non-contracted flight. (Mays Dep. 46:4–16, 47:14–19.) And because Mr. Bardell's underlying offense was committed on or about September 21, 2011 (*see* Docs. 1, 32), the flight, which cost $494.20, was within the allowable gratuity set forth in BOP policy. (*See* Ex. Y, Flight Receipt; *see also* Ex. W, Program Statement concerning Release, Gratuities, Transportation, and Clothing, p. 2.)

Taken together, the expense of Mr. Bardell's flight flowed from actions taken by FCI Seagoville employees in noncompliance with the Release Order. It was BOP's responsibility to provide Mr. Bardell with transportation to his release location. It was BOP's responsibility to comply with the Release Order. Because BOP directed the Bardells to pay for a flight that, at the time, was unauthorized by

---

[14] According to his Release Authorization form, Mr. Bardell had $22.36 in his personal property and funds. (Ex. Z, Release Authorization Form for Mr. Bardell.) In any event, he did not have sufficient personal funds to pay for his travel expenses.

the Court's Release Order, the Special Master concludes that a compensatory award in the amount of the flight cost is appropriate.

### 2. The Absence of Compensable Damages Flowing from the Absence of a Medical Air Flight

While the Special Master concludes that the *cost* of Mr. Bardell's flight is compensable, compensatory damages based on the *type* of flight he took—that is, commercial flight, rather than an air ambulance—cannot be awarded to the Bardells here. Such injuries are not traceable to BOP's failure to comply with Release Order in these proceedings.

Importantly, Ms. Copeland's call with Mr. Bardell on the morning of his release cuts off such damages. Once Ms. Copeland acquiesced to BOP booking a commercial flight for Mr. Bardell—with specific reference to the avoidance of air ambulance expenses—it could no longer be said that, absent BOP's violation, Mr. Bardell would have otherwise received medical air transport. The release plan that Ms. Copeland and Probation were finalizing contemplated release to Baptist Medical Center in Jacksonville. While it may have initially contemplated air ambulance transport, the plans appear to have evolved during Ms. Copeland's recorded phone call with Mr. Bardell on the day of his release. Moreover, in their respective interviews with the Special Master, Mr. Shea, Mr. Lubinski, Ms. Boughner, and Mr. Pinto from Probation each stated that they never discussed medical air transport with Ms. Copeland when formulating a release plan. As such,

any damages that flowed from BOP's conduct in dropping Mr. Bardell off at the curb of the DFW airport to board a commercial flight were not caused by BOP's violation of the Approval Condition in the Release Order. The call demonstrates that, had BOP waited for Probation to approve a release plan, compliant release according to that plan would have still been to Jacksonville and not by air ambulance transport. An award of damages based on the troubling circumstances of Mr. Bardell's travel without a causal link to BOP's violation would be punitive, not compensatory. In the absence of proof of recklessness beyond a reasonable doubt—the standard for imposing *criminal* contempt sanctions—such an award would be improper. *See Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (providing that a sanction imposed pursuant to *civil* procedures must be compensatory rather than punitive in nature).

### 3.   The Special Master's Fees and Expenses

Compensatory damages in civil contempt proceedings appropriately include attorney fees. In awarding such fees as a sanction, "the [C]ourt can shift only those attorney's fees incurred because of the misconduct at issue. Compensation for a wrong, after all, tracks the loss resulting from that wrong." *Goodyear*, 137 S. Ct. at 1186. "A fee award is so calibrated if it covers the legal bills that the litigation abuse occasioned." *Id.* "[N]o willful or intentional violation of a court order is

required for attorneys' fees to be granted as a contempt sanction." *PlayNation*, 939 F.2d at 1215.

Here, as a result of BOP's conduct, the Special Master expended time investigating the circumstances of the Mr. Bardell's release and briefing the Court on his recommendations. This time would not have been expended had BOP complied with the Release Order. *See Bayas v. Nor-Marathon Serv. Ctr., Inc.*, No. 16 CV 356 (FB) (CLP), 2017 WL 10745150, at *9 (E.D.N.Y. Apr. 19, 2017) (awarding attorney fees as a contempt sanction based on the court's finding that the defendants "incurred attorneys' fees they would not have had to incur had plaintiff's counsel complied with th[e] [c]ourt's Orders"). Such a result is consistent with applicable compensation considerations in the Federal Rules of Civil Procedure for appointing a special master. *See* Fed. R. Civ. P. 53(g)(3) (providing that a court must allocate payment among the parties upon its consideration of, *inter alia*, "the extent to which any party is more responsible than other parties for the reference to a master").

Accordingly, the Special Master finds that sanctions for the Special Master's fees and expenses are warranted. Given that the Court has already ordered the payment of such fees, and the government has so consented (*see* Docs. 109, 110), the Special Master recommends that no additional sanctions for attorney fees be imposed.

## VI.    RECOMMENDATION

For the reasons discussed above, it is respectfully **RECOMMENDED** that:

1.    The Court **AFFIRM** that the parties to the instant civil contempt proceedings constitute the Special Master, BOP, and Warden Zook.

2.    The Court find BOP and Warden Zook in **CIVIL CONTEMPT**. The Special Master recommends that the Court find Warden Zook in contempt in an official capacity.

3.    The Court **SANCTION** BOP in the amount of $494.20 payable to Charlotte and Craig Bardell for Frederick Bardell's flight to Jacksonville on February 8, 2021, which was coordinated by FCI Seagoville employees in violation of the Release Order and paid for by the Bardells at BOP's request. If the Court finds Warden Zook in contempt in her individual capacity, the Special Master recommends that Warden Zook be directed to pay this sanction.

4.    Because the Court has already ordered payment of the Special Master's compensation for his services in prosecuting this contempt action, the Special Master concludes that no additional sanctions for attorney fees are warranted.

Dated: June 6, 2022

Respectfully submitted,

/s/ A. Lee Bentley, III
A. Lee Bentley, III, Esq.
Florida Bar No. 1002269
Bradley Arant Boult Cummings LLP
100 N. Tampa Street, Suite 2200
Tampa, FL 33602
Phone: 813.559.5500
Fax: 813.229.5946
Primary email: lbentley@bradley.com
Secondary email: dmills@bradley.com

*Temporary Special Master*

## VERIFICATION OF EXECUTIVE SUMMARY AND REPORT

I, A. Lee Bentley, III, declare:

     1.  I am a partner in the Government Enforcement and Investigations practice group at the law firm of Bradley Arant Boult Cummings LLP.

     2.  I have been assigned as temporary special master in this action to prosecute this contempt proceeding and prepare a report for the Court containing my recommendations.

     3.  I verify that the fact statements contained in my executive summary and report are based on the findings of facts and credibility assessments made during my investigation and founded on underlying documents, witness statements, and deposition testimony, as well as my review of relevant transcripts and notes and my discussion with the assisting employees under my supervision and control.

     4.  I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the statements made in the foregoing executive summary and report are true and correct to the best of my knowledge, information, and belief.

     Executed on June 6, 2022 in Tampa, Florida.


                                 A. Lee Bentley, III
                                 Temporary Special Master

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 6, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record. In addition, I served the designated attorney liaisons by electronic mail.

/s/ A. Lee Bentley, III