# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                     Case No. 6:11-cr-401-RBD-DAB

FREDERICK MERVIN BARDELL

_____

## ORDER

Judges carry the heavy burden of depriving individuals of their liberty. But the Bureau of Prisons shoulders the constitutional burden of protecting the remaining rights of the incarcerated while in custody. The possibility that the Bureau of Prisons would be so indifferent to the human dignity of an inmate in its care as the facts here demonstrate, increases the burden on the sentencing judge exponentially. This, of course, pales in comparison to the suffering of the inmate and his family.

Frederick Marvin Bardell was a convicted child pornographer. He was also a human being. Sentenced in June 2012 to 151 months in federal prison, Mr. Bardell ultimately found himself housed at the Seagoville Federal Correctional Institute in Seagoville, Texas, under the supervision of Warden Kristi Zook. (Doc. 59; Doc. 77, p. 6.) While in federal custody Mr. Bardell developed an intestinal mass that developed into metastatic colon cancer. (Doc. 106-4, p. 306.)

On November 6, 2020, Mr. Bardell filed a counseled Emergency Motion for

Compassionate Release, contending that he suffered from "unspecified bleeding," "metastatic liver lesions (suspected cancer)," and "malignancy in his colon." (Doc. 77, p. 4.) These facts were attested to by Celio O. Burrowes, M.D., who averred that Mr. Bardell "ha[d] a high likelihood of having cancer of the colon with likely metastasis to the liver." (Doc. 77-1. p. 2.) Troubled by the apparent severity of Mr. Bardell's condition, the Court ordered the Government to supply the medical and administrative record for Mr. Bardell and to respond to the motion in an expedited fashion. (Doc. 78.) In response, AUSA Emily C. L. Chang, focused, in the main, on the Bureau of Prisons' ("BOP") COVID-19 protocols and argued that while Mr. Bardell has "liver lesions highly suspicious for metastatic disease . . . to date, no one has determined that [his] condition is terminal." (Doc. 80, p. 16.) The Government also argued that there was no indication that Mr. Bardell could not receive adequate care in custody. (*Id.* at 1.) Based, largely, on the Government's assurance that Mr. Bardell's condition had not been determined to be critical and that he was receiving adequate care, the Court denied his motion for compassionate release. (Doc. 85.) Concerned about the claim of delayed diagnosis and treatment, the Court ordered that a copy of the Order be provided to Warden Zook. (*Id.* at 6.) As we now know, it was not true that Mr. Bardell could receive adequate care in custody, and, regrettably, his condition was indeed terminal.

On February 2, 2021, Mr. Bardell filed a second counseled Emergency

Motion for Compassionate Release, this time supported by an affidavit from a board-certified oncologist who averred that Mr. Bardell required immediate specialized treatment from a medical oncologist specializing in metastatic cancer of the colon and that his medical condition was emergent and likely terminal. (Doc. 86-1, ¶¶ 41, 22, 24–25). That same day, the Court again directed the Government to respond to the motion, this time within forty-eight hours. (Doc. 87.) In its response, the Government asserted that Mr. Bardell had been examined on December 18, 2020, and that examination revealed "no evidence of malignancy." (Doc. 88, p. 3.) A colonoscopy was later performed on January 29, 2021, with results pending. (*Id.*) Based on those exams, despite Mr. Bardell's evidence, the Government again asserted that the BOP was adequately managing Mr. Bardell's medical condition and that his motion should be denied. (*Id.* at 3–4.) The Government maintained that it was not even definitive that Mr. Bardell had cancer—let alone terminal cancer. (*Id.*)

This time, the Court granted Mr. Bardell's motion, directed his attorney Kimberly Copeland, Esq. to work with the U.S. Probation Office to create a release plan, and ordered the BOP to release him from custody **AFTER** having an approved release plan. (Doc. 92, p. 6 ("Release Order").) But the BOP ignored the Release Order.

The day the Court issued the Release Order, Copeland began working with

Probation to form a plan for Mr. Bardell's release.[1] (Doc. 129, pp. 23–24.) But the BOP released Mr. Bardell without waiting for a release plan. (*Id.* at 37.) In disregard of the clear language of the Court's Order, the BOP unilaterally implemented its own release plan without Probation's input by contacting Mr. Bardell's parents and having them pay almost $500 for a commercial flight to bring their dying son home. (*Id.* at 29.)

Rather than a medical transport, the BOP chose a "trustee-inmate"—another prisoner—to get Mr. Bardell to the airport. (*Id.* at 6.) The trustee-inmate was apparently not authorized to get out of the vehicle to assist Mr. Bardell—though the BOP has no written policy to this effect. (*Id.* at 6, 37.) Mr. Bardell had to be pushed out of the prison in a wheelchair but the BOP did not allow him to keep the wheelchair for his travel. (*Id.* at 9, 37.) So Mr. Bardell was deposited on the curb of the Dallas/Fort Worth ("DFW") airport to fend for himself. (*Id.*)

Somehow, Mr. Bardell managed to get a wheelchair. (*Id.* at 38.) Now skin and bones, wheelchair dependent, and bladder and bowel incontinent, Mr. Bardell flew commercial from DFW to Jacksonville, Florida. He was forced to navigate the busy DFW and Atlanta airports and he endured a layover and change of planes, alone. (*Id.* at 9, 37.) A good Samaritan fellow passenger helped Mr. Bardell off the

---

[1] Probation's plan in process included Bardell taking a commercial flight to Jacksonville, Florida, though Copeland had been making her own arrangements for Bardell to be medically transported by air. (Doc. 129, pp. 23, 26–27.)

4

flight. (*Id.* at 38.) Mr. Bardell, who had a tumor protruding from his stomach and was visibly weak and bleeding, unsurprisingly soiled himself during this not so bon voyage. (*Id.*) He was nearly unrecognizable to his parents, who waited at the end of his long odyssey to take him to the hospital. (*Id.*) They described Mr. Bardell as a "whittled old man with gray hair." (*Id.*) Once Mr. Bardell's parents were reunited with their son and attempted to get him in the car, his father had to take off his own shirt and put it on the seat of Copeland's car to absorb the blood and feces. (*Id.*) Copeland immediately drove Mr. Bardell to the hospital. (*Id.*) This is how Mr. Bardell, then 54 years old, arrived:







(Docs. 94-1, 94-2, 107-6.)

Mr. Bardell never made it out of the hospital. He died nine days after his release. (Doc. 97.) With timely diagnosis and treatment, Mr. Bardell's attesting physician assessed his chances of survival at 71%. (Doc. 77-1, ¶ 9; Doc. 86-1, ¶ 14.)

For its wholesale disregard of the Court's Release Order, the BOP is found to be in civil contempt and sanctions are imposed.

## BACKGROUND

Once notified of Mr. Bardell's death and the disturbing circumstances of his release, the Court issued a show cause order to the BOP and Warden Zook why they should not be held in contempt for violating the Release Order, to which they responded. (*See* Doc. 99 ("OSC"); Docs. 106–07.) The Court appointed former U.S. Attorney A. Lee Bentley, Esq. as Special Master to develop a record for further investigation and recommendation. (Docs. 109, 111.) The Court ordered the BOP to pay for the Special Master's attorney's fees. (*See* Doc. 111, ¶ 7.) On completion of his investigation, the Special Master recommended the Court find the BOP and Warden Zook (in her official capacity) in civil contempt and impose sanctions.[2] (Doc. 129 ("R&R").) The Special Master found:

- The BOP and Warden Zook had the ability to comply with the Release Order.

---

[2] Neither party objected to the Special Master's appointment or the R&R. (Docs. 110, 130–32.)

- There were *no* procedures in place to ensure court orders were followed.

- Most BOP employees did not even read the Release Order.

- No BOP employee attempted to speak to Probation to comply with the approved release plan condition.

- No BOP employee considered whether Bardell should have been provided assistance given his medical condition.

(Doc. 129, pp. 4–6, 45, 65.) Further, though it is the BOP's responsibility to pay for an inmate's transportation once released, it refused to pay for Mr. Bardell's flight. (*Id.* at 5, 46–47; Doc. 129-24, p. 6.) Instead, his parents paid. (Doc. 129-26.)

At the hearing, the Court adopted the Special Master's recommendation, held the BOP and Warden Zook in civil contempt, and sanctioned the BOP. (*See* Doc. 135.) This Order memorializes the oral pronouncements made in the hearing.

## STANDARDS

A finding of civil contempt must be based on clear and convincing evidence that: "(1) the allegedly violated order was valid and lawful; (2) the order was clear, definite and unambiguous; and (3) the alleged violator had the ability to comply with the order." *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000). Civil contempt sanctions may either coerce the party into compliance or compensate the injured party for losses sustained. *See In re McLean*, 794 F.3d 1313, 1323 (11th Cir. 2015). Once the "contumacious conduct" ceases, the need for a coercive sanction ends, but the court retains the power to impose compensatory sanctions. *FTC v.*

*Garden of Life, Inc.*, 516 F. App'x 852, 860 (11th Cir. 2013).[3] Damages only need to be shown by a preponderance of the evidence. *See McGregor*, 206 F.3d at 1387. A compensatory sanction "reimburses the injured party for the losses and expenses incurred because of his adversary's noncompliance. This [reimbursement] includes losses flowing from noncompliance . . . ." *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450, 458 (11th Cir. 1984).

## ANALYSIS

### I.    Civil Contempt and Sanctions

The Special Master recommended finding that the Release Order was lawful and unambiguous and that the BOP and Warden Zook had the ability to comply. (Doc. 129, p. 4); *see McGregor*, 206 F.3d at 1383. Neither the BOP nor Warden Zook dispute this finding, implicitly acknowledging that they disregarded the Court's directives. (Docs. 131, 132.) So the BOP and Warden Zook[4] are held in civil contempt for their violation of the Release Order.

As for sanctions, the Special Master recommends imposing compensatory sanctions against the BOP in the form of reimbursing[5] Mr. Bardell's parents for the

---

[3] *See* 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[4] The Court holds Warden Zook in civil contempt only in her official capacity given that all actions she undertook were in the course of her duties as a warden. (*See* Doc. 129, pp. 58–60); 28 U.S.C. § 2679(d)(1).

[5] The Special Master did not recommend a sanction regarding the possibility of Mr. Bardell being medically transported by air because he may have traveled through commercial flight even if the BOP and Warden Zook had complied with the Release Order—

commercial flight and requiring the BOP to pay for the Special Master's attorney's fees as the Court previously ordered, which currently total over $200,000. (*See* Doc. 111, ¶ 7; Doc. 129, pp. 73–80; Doc. 132, p. 2 n.2); *Garden of Life*, 516 F. App'x at 860. Again, the BOP does not contest this sanction. The Court adopts the Special Master's recommendation and finds that reimbursing Mr. Bardell's parents for the flight they purchased, along with paying the Special Master's fees, are appropriate sanctions against the BOP. These consequences are, unfortunately, grossly inadequate to address the callous disregard for Mr. Bardell exhibited by his custodians but the Court's sanction toolbox is limited when dealing with civil contempt.

While the sanctions imposed are remedial in nature and restricted by law, the Court admonishes the BOP and Warden Zook for their blatant violation of a Court Order and sheer disregard for human dignity. The BOP as an institution and Warden Zook as an individual should be deeply ashamed of the circumstances surrounding the last stages of Mr. Bardell's incarceration and indeed his life. No individual who is incarcerated by order of the Court should be stripped of his right to simple human dignity as a consequence. The purposes of incarceration, which include rehabilitation, deterrence, and punishment, do not include depriving a

---

though nothing is certain because the BOP did not wait for an approved plan before releasing Mr. Bardell. (Doc. 129, pp. 6, 7.)

human being of the fundamental right to a life with some semblance of dignity. The treatment Mr. Bardell received in the last days of his life is inconsistent with the moral values of a civilized society and unworthy of the Department of Justice of the United States of America.

The BOP does not just bear a constitutional responsibility to care for incarcerated human beings. The BOP, like every other government entity in this country, must follow the Orders entered by United States District Courts by the power vested in them by Article III of the U.S. Constitution. They are not above the law or beyond its reach however insular may be their operation.

The Court is hopeful that in some small way, these proceedings will illuminate the BOP's arrogant—and wholly mistaken—notion that it is beyond reproach and the reach of the Court. It is not. If any institution should embody respect for the Rule of Law, it is an agency that operates under the aegis of the Department of Justice. This Court will do everything in its power to ensure that the BOP is held to account for its demonstrated contempt for the safety and dignity of the human lives in its care.

## II.    The Court's Recommendations

Though this contempt proceeding focused primarily on the circumstances surrounding Mr. Bardell's release, the Court is also troubled by his care and treatment while confined, especially during the latter stages of his incarceration.

(*See, e.g.*, Doc. 86-1.) The Court has serious reservations about the adequacy of his treatment and diagnosis. In light of these concerns, the Court recommends that the Attorney General (or Inspector General for the Department of Justice) undertake an investigation into the circumstances of Mr. Bardell's confinement and treatment, the failure of the BOP to respond to his medical needs, and the BOP's misrepresentations in connection with the compassionate release briefing regarding the seriousness of his condition.

On a parallel track, the Court retains jurisdiction to continue investigating the circumstances surrounding the truthfulness of the assertions in the Government's filings as well as Mr. Bardell's incarceration and release. To this effect, the Court does not discharge the Special Master from his duties, as further directives and Orders may follow.

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED**:

1. The R&R (Doc. 129) is **ADOPTED**, **CONFIRMED**, and made a part of this Order in its entirety.

2. The OSC (Doc. 98) is **DISCHARGED**.

3. The BOP and Warden Kristi Zook in her official capacity are **HELD IN CIVIL CONTEMPT** for violating the Release Order (Doc. 92).

4. By **Monday, October 17, 2022**, the BOP is **ORDERED** to reimburse

Mr. Bardell's parents for the commercial flight totaling $494.20.

5.    The Court **RECOMMENDS** that the Attorney General, Office of the Inspector General, or other appropriate investigative offices undertake an examination into the conditions of Mr. Bardell's confinement, treatment, and misrepresentations to the Court.

6.    By **Monday, October 17, 2022**, attorneys for the BOP and Warden Zook, Julie Posteraro, Esq., and Glenn S. Greene, Esq., are **DIRECTED** to certify that they have served this Order on the following parties:

    a.    The Director of the BOP;

    b.    The Attorney General of the United States;

    c.    The Deputy Attorney General of the United States; and

    d.    The Office of the Inspector General for the Department of Justice.

7.    By **Tuesday, October 18, 2022**, the Special Master is **DIRECTED** to file a motion to recover fees and costs incurred through the date of this Order or to otherwise file a notice with the Court certifying that the billing is current under (Doc. 111, ¶ 7).

8.    The Court **RETAINS JURISDICTION** to continue its own investigation into the Government's misrepresentations to the Court

and Mr. Bardell's confinement and release.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on October 4,

2022.



ROY B. DALTON JR.
United States District Judge

Copies:
A. Lee Bentley, Esq.
Kimberly L. Copeland., Esq.
Glenn S. Greene, Esq.
Julie Posteraro, Esq.